STATE OF NORTH CAROLINA v. BOBBY RAY JOHNSON, JR.

No. 525A83

(Filed 12 August 1986)

### 1. Homicide §§ 18, 15.4 — murder — expert testimony on intent — no prejudice

The trial court erred in a murder trial which occurred before the effective date of N.C.G.S. Ch. 8C by permitting the State's expert to testify that in his opinion defendant was able to form the specific intent to kill on the night of the murder; however, defendant was convicted of first degree murder on the theories of premeditation and deliberation and felony murder, and the guilty verdict based on felony murder remained unsullied. Judgment on the underlying felony was arrested.

### 2. Criminal Law § 75.1 — questioning by officers — no seizure under Fourth Amendment — confession admissible

Defendant's confession in a prosecution for murder, rape, and kidnapping was properly admitted where defendant was not deprived of his freedom or restrained in such a manner as to constitute being seized for purposes of Fourth Amendment analysis. Defendant was asked on a public street to accompany officers to the police station as a possible witness; defendant was not frisked before getting in the car; he sat alone in the back seat of the unmarked car while detectives rode in front; the detectives did not ask defendant to empty his pockets or frisk him in the interview room; the door to the interview room was not locked; defendant was told several times that he would be taken home; detectives provided defendant with cigarettes and coffee; defendant was allowed to go unescorted to the bathroom and to make two telephone calls; defendant was left alone and unsupervised in the interview room; the detectives questioning him never raised their voices, never talked in a loud, threatening manner, and never called him a liar; one detective stated that he had wanted to meet defendant because he wanted to meet a cold-blooded killer; and defendant acknowledged that he had been arrested several times previously and had known, understood, and waived his rights, although he thought that when he was read his rights it meant he was going to jail.

### 3. Criminal Law § 91.2 — pretrial publicity — continuance denied — no error

The trial court did not err in a prosecution for kidnapping, rape, and murder by denying defendant's motion for a continuance based on pretrial publicity concerning defendant's effort to avoid a death sentence by pleading guilty. The standard of showing prejudice is the same for a continuance as for a change of venue; both defense counsel and defendant stated affirmatively that they were satisfied with the jury as chosen; and the three jurors who stated that they had read either or both of the newspaper articles stated unequivocally that their exposure would not affect their ability to determine defendant's guilt or innocence based solely on the evidence introduced at trial.

### 4. Criminal Law § 106.4 — confession — corpus delicti — evidence aliunde sufficient

The trial court did not err by refusing to dismiss charges of rape and kidnapping because the State failed to establish the *corpus delicti* of either crime

where there was sufficient extrinsic evidence to support the jury's findings that the crimes charged occurred.

**5. Criminal Law §§ 91.11, 91.12— Speedy Trial Act—time for mental examination and discovery—properly excluded**

The trial court did not err by denying defendant's motion to dismiss under N.C.G.S. § 15A-701 to 704 where defendant was tried well within 120 days of indictment if the periods during which he was being examined at Dorothea Dix Hospital and during which the State sought to comply with his discovery request are excluded.

**6. Criminal Law §§ 33.4, 68— admission of cast of defendant's teeth and bite marks on victim—defendant did not dispute biting—probative value outweighs prejudicial effect**

The trial court did not err in a prosecution for kidnapping, rape and murder by admitting into evidence plaster casts of defendant's teeth and indentations on the deceased's breast and by allowing a demonstration of how defendant's teeth matched the bite marks. The evidence was relevant to show whether the deceased had been the victim of a violent sexual attack, whether it was defendant who had inflicted the injury, and as corroboration of defendant's confession; defendant may not preclude introduction of additional corroborative evidence by failing to contest facts contained in his extrajudicial confession.

**7. Constitutional Law § 63— death-qualified jury—constitutional**

The trial court did not err in a prosecution for kidnapping, rape and murder by death qualifying the jury.

**8. Jury § 7.12— death-qualified jury—defendant denied opportunity to rehabilitate—no error**

The trial court did not err by excusing a potential juror who expressed a clear refusal to invoke the death penalty before defendant had the opportunity to question and rehabilitate her; moreover, the juror was properly excluded under the *Wainwright* standard in light of her unequivocal initial and final statements that she would refuse to impose the death penalty regardless of the circumstances despite some confusion regarding her role as a juror in following the instructions of the trial judge.

**9. Jury § 7.8— jury selection—refusal to determine guilt of another—properly challenged for cause**

The trial court properly excused for cause a potential juror who clearly expressed her feeling that she would be unable to determine the guilt of another regardless of the circumstances. N.C.G.S. § 15A-1212(8) and (9).

**10. Jury § 5.2— irregularities in compiling jury list—underrepresentation of blacks—no error**

The defendant in a prosecution for kidnapping, rape, and murder was not denied his constitutional right to a trial by an impartial jury composed of a fair cross-section of the community where one of three duly-appointed jury commissioners was murdered four days before the Commission was required to submit a new list of potential jurors and the two remaining members proceeded

without waiting for a replacement; the data base adopted by the Commission did not include a list of licensed drivers residing in the county as required by N.C.G.S. § 9-2(c) because compatible computer software was not immediately available; and blacks represented 25.4 percent of the population of Guilford County but only 14.6 percent of the disputed venire. Defendant did not demonstrate that the two-person Commission acted with corrupt intent or that the use of a two-person Commission resulted in either systematic discrimination or irregularities affecting the actions of the jurors actually drawn and summoned; N.C.G.S. § 9-2(c) was not in effect when the jury list was compiled; the disparity of 10.8 percent between the county's black population and representation on the venire was not unfair or unreasonable; and defendant did not show that the Jury Commission's actions were representative of a systematic exclusion of blacks from the jury process. N.C.G.S. § 9-1. Sixth Amendment to the United States Constitution.

**11. Jury § 6— voir dire—question concerning mitigating factor—disallowed**

The trial court did not err in a prosecution for kidnapping, rape and murder by not permitting defense counsel to ask prospective jurors how they gauged the importance of the parent-child relationship and whether they could consider evidence of child abuse as a mitigating circumstance for sentencing purposes. Defendant was allowed to pose a similar question to potential jurors; mitigating circumstances submitted during the sentencing phase included that defendant was abused and neglected as a child and that he came from a broken home; the jurors found the existence of one mitigating factor; and the question was struck on the grounds that it was designed to elicit in advance what the jurors' decision would be under a given state of the facts.

**12. Criminal Law § 102.6— opening argument—reference to codefendant—no prejudice**

The trial court did not err by permitting a prosecutor during an opening argument to refer to a codefendant where the prosecutor stated that the codefendant's case was separate from defendant's and would not be a matter for the jury's concern. The comment in no way suggested that defendant was guilty, did not have the potential to affect the jury's deliberative process, and defendant failed to show that a different result would have been reached in the absence of this alleged error. N.C.G.S. § 15A-1443(a) (1983).

**13. Criminal Law § 6— instruction on intoxication by drugs not given—no error**

The trial court did not err in a prosecution for kidnapping, rape and murder by failing to give an instruction on intoxication by drugs where defendant could support his assertion that he was under the influence of PCP on the night of the murder only with a letter he had written which referred to buying "dust" but did not indicate that defendant had consumed the dust or was under its influence at the time of the murder. Moreover, defendant was given the benefit of a general instruction on voluntary intoxication as it related to premeditation and deliberation. N.C.G.S. § 15A-1232.

**14. Criminal Law § 114.2— final instructions—one portion of facts repeatedly recited—no expression of opinion**

The trial court did not improperly convey an opinion while instructing the jury on possible verdicts in a prosecution for kidnapping, rape and murder by

repeatedly reciting one portion of the facts regarding the rape and murder. N.C.G.S. § 15A-1232 does not preclude a thorough application of the facts to the law.

**15. Constitutional Law § 80— death penalty statutes—constitutional**

The Supreme Court declined to reevaluate decisions upholding the constitutionality of the North Carolina death penalty statutes. N.C.G.S. § 15A-2000 to 2003.

**16. Criminal Law § 73.1— telephone conversations—hearsay—no prejudice from exclusion**

There was no prejudicial error in a prosecution for kidnapping, rape and murder in the exclusion of telephone conversations between defendant's foster mother and mother as hearsay. Even if the conversations were admissible to show the attitude of defendant's mother toward defendant, there was ample other testimony revealing defendant's mother's attitude toward him.

**17. Criminal Law §§ 34, 89.10— kidnapping, rape, murder—testimony of prior fight with others—no prejudice**

There was no prejudice in a prosecution for kidnapping, rape and murder from the admission of testimony from defendant's sister about a fight between defendant's mother, sister, and others and defendant's girlfriend in which defendant had drawn a knife but had not pointed it at anyone. Testimony concerning the witness's role in the altercation was admissible to impeach her testimony and, while testimony concerning defendant's use of a knife should not have been admitted, the fact that he used it apparently in an effort to protect or aid a victim of physical assault may have impressed the jury favorably. Moreover, there was evidence in the case quite persuasive of defendant's guilt.

**18. Criminal Law § 169.3— psychiatrist's opinion as to motive—admitted elsewhere—no error**

There was no prejudice in the penalty phase of a prosecution for kidnapping, rape and murder in the exclusion of a psychiatrist's opinion as to defendant's motive in the killing because the same evidence was later given in the hearing of the jury.

**19. Criminal Law § 102— first degree murder—effect of jury disagreement on death sentence—argument not permitted**

The trial court did not err in a prosecution for first degree murder by refusing to allow defense counsel to read and argue to the jury N.C.G.S. § 15A-2000(b), which provides a life sentence if the jury cannot unanimously agree on a sentence recommendation.

**20. Criminal Law § 135.7— murder—instruction on weighing aggravating and mitigating circumstances—no error**

The trial court did not err in a first degree murder prosecution by instructing the jury that if it found that the aggravating circumstances outweighed the mitigating circumstances and that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty then it would be the jury's duty to recommend that defendant be sentenced to death.

State v. Johnson

**21. Criminal Law § 135.9— murder—mitigating factors—conjunctive instruction on intoxication and emotional disturbance—no error**

The trial court did not err in a prosecution for kidnapping, rape and murder in its instructions on mitigating factors by its conjunctive, simultaneous references to both defendant's intoxication and atypical dissociative disorder where evidence of defendant's intoxication had originally been presented as a mitigating circumstance in conjunction with defendant's emotional history; moreover, the court's instruction regarding substantial impairment by alcohol reflected the proper legal standard and cannot reasonably be interpreted as a comment on the evidence.

**22. Criminal Law § 135.9— murder—mitigating circumstance of age not submitted—no error**

The evidence did not require the trial court to submit the mitigating circumstance of age when the opinions of defendant's foster parents that he was emotionally immature are balanced against defendant's chronological age of twenty-three, his apparently normal physical and intellectual development, and his level of experience. N.C.G.S. § 15A-2000(f)(7).

**23. Criminal Law § 135.8— murder—especially heinous, atrocious or cruel—supported by evidence**

The evidence supported the submission to the jury in a first degree murder prosecution of the possible aggravating circumstance that the crime was especially heinous, atrocious or cruel where defendant and a companion sought the victim out and returned to pick her up for the express purpose of raping her; the victim's protestations once she realized their intentions were met with hostility and physical violence; defendant's confession and bloodstains in the car indicated that the victim was stabbed at least once and struck across the eye in the car; the victim was dragged from the car, bruised and bleeding, her clothing was ripped from her body, and she was stabbed in the arm; she was then thrown to the ground and sexually assaulted by defendant as his companion held her down; defendant savagely bit her on the left breast; the victim was conscious, in pain, and aware that she was engaged in a life and death struggle; defensive wounds in her hand indicated that she attempted to fend off the knife attack; defendant ultimately inflicted fifty-five stab wounds upon the victim; and perhaps fifteen to twenty minutes elapsed between the time the victim was first stabbed in the car and the time she finally died. Defendant's preliminary acts of violence were all a part of the same transaction and may properly be considered.

**24. Criminal Law § 135.10— first degree murder—erroneous aggravating circumstance—new sentencing hearing**

A defendant was entitled to a new sentencing hearing on his conviction of first degree murder where he was convicted of first degree murder based on premeditation and deliberation and based on felony murder, the verdict of guilt based on premeditation and deliberation was set aside, the verdict of guilty was therefore based only on felony murder with rape as the predicate felony, and it was therefore error to submit as an aggravating circumstance that the murder was committed while defendant was engaged in the commission of rape. N.C.G.S. § 15A-1443(b) (1985).

Justice BILLINGS did not participate in the consideration or decision of this case.

APPEAL from judgments entered by *Albright, J.,* 18 October 1983 in Superior Court, GUILFORD County. Defendant was convicted by a jury of murder in the first degree, rape in the first degree, and kidnapping in the first degree. Defendant was sentenced to death for the murder conviction, life imprisonment for the rape conviction, and forty years' imprisonment for the kidnapping conviction, all sentences to run consecutively. Defendant appealed the murder and rape convictions pursuant to N.C.G.S. § 7A-27(a). On 6 January 1984, we allowed defendant's motion to bypass the Court of Appeals on the kidnapping conviction. Heard in the Supreme Court 12 March 1985.

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the state.*

*Smith, Patterson, Follin, Curtis, James & Harkavy, by Charles A. Lloyd, Martha E. Johnston, John A. Dusenbury, Jr., Donnell Van Noppen III, and Davison M. Douglas, and Stephen S. Schmidly for defendant.*

MARTIN, Justice.

For the reasons set forth below, we arrest judgment on the rape charge. In addition, defendant is granted a new sentencing hearing on his conviction of murder in the first degree. We find no error in the kidnapping trial or sentencing.

On 3 December 1982 the body of Donna Phillips was discovered near a turnaround area on Rock Quarry Road in Guilford County. The body was lying on its left side, the victim's midsection bare, with a sweater, vest, and bra lying around her neck, and her jeans and underclothing near her ankles.

An autopsy was performed by Dr. John Butts, associate chief medical examiner for the state. He discovered approximately fifty-five separate stab wounds on the torso, right arm, thigh, and back, with thirty-eight of these being in the chest area, passing from the left of the left breast to below the right breast. The blade used, he testified, was approximately one-half inch wide and three to four inches long. One stab wound which passed complete-

ly through the right hand was, in his opinion, a defensive wound. He also found, among other injuries, a recent bruise on the right eye, scratches, and human bite marks on both the left thigh and the left breast. In his opinion, any one of approximately twenty stab wounds which punctured the lungs, abdominal cavity, or heart could have caused the victim's death, which resulted from bleeding into the chest cavities or from an interruption of the heart rhythm.

In the course of the autopsy, Dr. Butts also found that the deceased had a blood alcohol level of .15 percent, and he discovered the presence of occasional sperm in the victim's vagina, consistent with having had intercourse resulting in incomplete ejaculation within two or three days, although he detected no trauma to that area.

Based on information they had received that Bobby Ray Johnson, Jerry Williams, and a female had been seen leaving a bar called the "Rock" with Donna Phillips on the night of the killing, Guilford County Sheriff's Department officers located defendant and Williams on 4 December 1982 and requested that they come to headquarters to be questioned concerning the last known whereabouts of the victim. Initially, Johnson and Williams, who were interviewed separately, told the detectives that they had met Donna Phillips at the Rock on 2 December and had taken her part of the way home, but the last time they had seen her was when they had let her out of the car. Eventually, defendant confessed to the killing, rape, and kidnapping of Donna Phillips.

With respect to defendant's confession, the state presented the testimony of Lt. James Sheppard and detectives Jonathan Jacobs, A. J. Dunevant, and Richard Jackson of the Guilford County Sheriff's Department. Their testimony tended to establish the following: After being told by Johnson's mother and sister that Bobby would likely be walking home, Jacobs and Dunevant parked in a parking lot along the route to wait for defendant. When they spotted defendant walking down the street at 2:18 p.m., they approached him and asked him if he would accompany them to the sheriff's department to talk with them about an incident that had occurred the previous night. Neither detective was wearing a law enforcement uniform. Detective Jacobs told Johnson that after they finished their discussion he would be happy to

drive Johnson back home. After asking Detective Jacobs a second time what it was about, Johnson said he would go with them, and the three got into the detectives' unmarked car, with the officers in the front seat and Johnson in the back. Johnson was neither frisked, touched, threatened, told he was under arrest, read his Miranda rights, nor told he had to go with them. On the way to headquarters, Johnson once more asked why the officers wanted to question him, and again they told him they wanted to talk to him because he might have information concerning the events of the previous morning. The officers testified that defendant was not a suspected perpetrator of the crime, but was considered merely a possible witness.

Upon their arrival at the station, the officers recounted that the three went into an interview room. Jacobs and Dunevant testified that they read the defendant his rights, even though at that time he was considered merely a witness and not a suspect. Defendant signed a written waiver of his rights. Between 2:40 and 5:55 p.m., Johnson was questioned by Jacobs, Dunevant, and a Detective Shaver, who again read the defendant his rights. Once more, the defendant waived his rights. During the afternoon defendant's movement was not restricted, and he was freely allowed to use the telephone and restroom without being monitored or guarded in any way. Defendant was cooperative during the entire interview; he never indicated he wanted to leave and never indicated he wanted to be taken home. The detectives testified that although Johnson adhered to his story that the last time he had seen Donna Phillips was when she was let out of the car, there was a discrepancy between Johnson's and Williams' accounts of exactly where she was let out.

At 5:55 p.m., Lt. Sheppard entered the interview room with Detective Jackson, who said he merely wanted to meet Bobby Johnson. After introductions were made, Detective Jackson asked Johnson whether he knew and understood his rights, and defendant replied "yes." Jackson then said, "I just wanted to meet a cold-blooded killer." Johnson responded, "Now wait a minute, I have already talked to the other officers and have told them my story." Jackson answered that he knew what Johnson had told the other officers, but he knew the truth and the truth was that Johnson was a cold-blooded killer. Johnson then began to cry and said that the police never understood him. When Jackson said he

was willing to listen to him and that everybody had a good side to him, Johnson began talking about his mother. He said that his mother did not understand him, that she was always interfering with his girlfriends by running her mouth to them, and that she kept on running her mouth. Jackson said, "Sort of like Donna?" and the defendant said "yes." "Was Donna running her mouth?" Jackson inquired, and defendant said "yes." "Did you shut Donna up?" Jackson asked, and defendant said "yes" and began to cry again. When Jackson asked Johnson if he wanted to start at the beginning and tell his side of it, defendant said he did and thereupon made a full confession. After Johnson was placed under arrest, he stood up, reached in his pocket, handed Jackson a knife, and said, "I guess you will want this, the murder weapon." He then pointed to some blood on his shoes and said, "I guess you will want the tennis shoes." Sheppard also testified that defendant had told him that he thought it would never have happened had the victim not cursed at him and that he was sorry it had happened.

Defendant's confession showed that in the late evening on 2 December 1982 Bobby Ray Johnson and two companions, Jerry Williams and Cheryl Cassaro, went to a bar called the "Rock" (now known as the Country Playground) on Burlington Road in Guilford County. While there, they ran into Donna Phillips, with whom defendant had been acquainted since childhood. The four of them played pool and drank beer together. At about 1:15 a.m., Donna told Johnson that the friends with whom she had arrived had left her and asked if he thought Williams would give her a ride to a friend's house where she had left her car. When defendant said "sure," Donna and defendant got in the back seat and Williams and Ms. Cassaro sat up front. En route, defendant asked Donna if she wanted to spend the night with him at Williams' house, and she replied that she didn't. Shortly thereafter Cheryl and Donna began arguing over which of them should be taken home first. Finally, Donna requested that she be let out immediately. Williams pulled over on Burlington Road, let Ms. Phillips out, and proceeded to the Cassaros' house. After Cheryl got out, she told the two men, "Don't go back and pick that girl up." As they drove away, Williams said to defendant, "We should go back and get us some." The two men then talked about raping Donna and drove around on Wendover and Bessemer Avenues until they

saw Ms. Phillips walking down the street. They stopped and asked her if she wanted a ride. When she said she did, Johnson got out and let her in the front seat between himself and Williams. As soon as they were all inside the car, Williams turned the car around and headed out Burlington Highway towards McLeansville, away from where Donna had said she had left her car. Donna demanded to know where they were going and began to curse the two men. When defendant refused her demand to be let out of the car, she began hitting and cursing him. Johnson then hit her in the face, throwing her down onto the seat. When she continued to yell and began kicking at the steering wheel and at Williams, the defendant took out his knife and stabbed her in the leg while Williams attempted to hold her legs down across his lap. At some point defendant also knocked her across the face with his elbow.

At a store off Highway 70, they turned onto a dead-end dirt road and stopped. Defendant got out of the car, dragging Ms. Phillips with him. Williams got out, held Donna's arms behind her back, and told defendant to "go ahead and kill her." Instead, Johnson tore her sweater and bra off, forced her down to the ground, and raped her. When he had finished, he asked Williams if he "wanted some" also. Williams replied, "No. Go ahead and kill her." Johnson then took his knife and began stabbing Ms. Phillips.

When Donna, still breathing, got quiet and lay still, the two men got in the car and went to a car wash. They washed the blood off themselves, the car, and the knife. After buying some cigarettes at a convenience store, Johnson realized he had lost his hat. Thinking he might have left it where they had taken Ms. Phillips, they drove back to look for it. After an unproductive search for the hat, they went over to the victim's body, picked it up by one arm, and then dropped it to see if she was dead. Williams took a set of keys from Donna's coat, and defendant took her belt out of her pants, which he said he wanted to give to his girlfriend for Christmas. The two men left. On the way back to Greensboro, Williams threw the keys and belt out the car window.

Dr. Forrest Irons, a forensic odontologist, testified that at the request of Dr. Butts he had made a flexible cast of contusions and indentations on decedent's left breast as well as impressions of both Johnson's and Williams' teeth. After these exhibits were

introduced into evidence, Dr. Irons demonstrated to the jury that the mold of defendant's teeth matched the indentations on the cast of the deceased's breast. The fact that they matched gave rise to his opinion that Bobby Johnson had bitten Donna Phillips on the breast.

In addition to defendant's confessions, the murder weapon, and other physical evidence introduced at trial, the state also introduced into evidence twenty-three of approximately forty letters written by defendant to his girlfriend between 4 December 1982 and 4 March 1983 while he was in jail. These letters corroborated in harrowing detail the statements by the defendant, as well as other evidence concerning the crime.

The defense presented the testimony of Cheryl Cassaro to the effect that she believed the defendant to be intoxicated on the night of the murder, even more drunk than Donna Phillips. On cross-examination, over objection, the district attorney was permitted to elicit her opinion that Bobby Ray Johnson was not so drunk that he could not form the specific intent to kill. The defendant did not testify.

In rebuttal, the state called the bar manager of the Country Playground where defendant and his friends had been drinking. In her opinion, neither Johnson nor Donna Phillips was drunk because the bar did not sell beer to people who were visibly intoxicated. The state also called Dr. Bob Rollins, a forensic psychiatrist employed by the state and appointed by the court to examine the defendant. He testified that he had examined and evaluated the defendant and was of the opinion that Johnson was able to form the specific intent to kill Donna Phillips.

On 13 October 1983, the jury found defendant guilty of murder in the first degree on the basis of malice and premeditation and deliberation as well as under the felony murder rule. The jury also found the defendant guilty of rape in the first degree and kidnapping in the first degree.

In the sentencing phase for murder in the first degree, Doris Stanley testified that defendant was her foster child when he was between the ages of sixteen and eighteen because his mother was in jail for drunk driving and child abuse and Johnson had been out on the streets and into trouble. She said that he was im-

mature, starved for attention, and had marks on him as a result of the physical abuse inflicted by his mother. Johnson had told Mrs. Stanley that his mother had bitten him, called him names, and abused him in many other ways. Defendant's sister and his foster father also testified to episodes of neglect and violence by defendant's mother and about times when she had bitten, struck, kicked, and verbally abused Bobby Johnson. Defendant's sister also testified that in October 1982, during an altercation involving herself, her mother, and defendant's girlfriend, defendant had pulled a knife from his pocket.

Defendant also introduced the testimony of Dr. Rollins and of Dr. Allen Sherrow, a Greensboro psychiatrist in private practice. Dr. Rollins' opinion was that a combination of defendant's use of alcohol and the effects of defendant's abused and neglected childhood caused the defendant to kill Donna Phillips but that neither of these elements alone would have been sufficient. Dr. Rollins also repeated the testimony he had given at the guilt-innocence phase that he considered defendant to have been able to form the specific intent to kill on the night of the murder. Dr. Sherrow stated it was his opinion that at the time of the killing defendant was suffering from an atypical dissociative disorder as well as from alcohol intoxication. A fight defendant had had with his girlfriend, the fact that defendant came from a broken home and had a background of abuse and neglect, the influence of alcohol, and the provocation by the victim all combined to influence the defendant's actions in the early morning of 3 December, Dr. Sherrow said. Both Drs. Rollins and Sherrow stated that they believed that defendant's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was impaired at the time he killed Donna Phillips.

Several statutory and nonstatutory circumstances were submitted to the jury to be considered in mitigation:

(1) This murder was committed while Bobby Ray Johnson, Jr. was under the influence of mental or emotional disturbance.

(2) The capacity of Bobby Ray Johnson, Jr. to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

(3) The defendant aided in the apprehension of another capital felon.

(4) The defendant was abused and neglected as a child.

(5) The defendant came from a broken home.

(6) Any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value.

The jury found at least one of these circumstances to exist but did not specify which one(s). The jury also found the following circumstances in aggravation: the murder was committed while the defendant was engaged in the commission of first degree rape, and the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(5), (9) (1983). Upon unanimously finding beyond a reasonable doubt that the mitigating circumstance(s) were insufficient to outweigh the aggravating circumstances and that the circumstances in aggravation were sufficiently substantial so as to call for the imposition of the death penalty, the jury recommended a sentence of death. Judgment of execution was entered on 18 October 1983.

## I. GUILT-INNOCENCE PHASE

[1] Defendant first argues that the trial court erred in allowing two witnesses to testify that defendant was able to form the specific intent to kill Donna Phillips. This argument is based on defendant's contention that evidence of a defendant's mental capacity or incapacity to form the specific intent to kill is not admissible in North Carolina courts as it constitutes opinion evidence and invades the province of the jury.

During the guilt phase of the trial, defendant presented testimony of Cheryl Cassaro to the effect that shortly before the killing defendant was more drunk than Donna Phillips. Autopsy revealed that Donna Phillips' blood alcohol content was 0.15 percent. On cross-examination and over objection, the prosecuting attorney was permitted to elicit testimony from Cassaro that even though defendant had some difficulty walking, he was talking in a normal manner, and that she could not say he was unable to form the specific intent to kill Ms. Phillips. Later, in rebuttal, the state offered the testimony of a forensic psychiatrist, Dr. Rollins, who testified:

Q. Based on your examination of this particular Defendant, do you have an opinion satisfactory to yourself as to whether or not this Defendant would have been able to form the specific intent on December the 3rd, 1982, to kill Donna Phillips?

MR. SCHMIDLY: Object.

THE COURT: Overruled.

THE WITNESS: I have an opinion.

Q. What is that opinion, Doctor Rollins?

A. My opinion, he was able to form that specific intent.

On cross-examination, the defense attorney asked:

Q. Doctor Rollins, you said he was able, in your opinion.

A. Yes.

Q. Do you know whether he did?

A. Did what?

Q. Did form the specific intent?

A. Well, it's my assessment he did.

Defendant submits that this Court has held for many years that testimony of a defendant's ability to form an intent to kill is to be excluded from evidence. He argues that the opinion evidence invaded the province of the jury and should have been excluded. *State v. Matthews*, 226 N.C. 639, 39 S.E. 2d 819 (1946) (rule allowing opinion evidence on defendant's sanity does not permit witness "to testify whether defendant had mental capacity to commit the particular act charged"). *See State v. Hauser*, 202 N.C. 738, 164 S.E. 114 (1932). *Cf. State v. Harris*, 213 N.C. 648, 197 S.E. 142 (1938) (lay opinion testimony admissible when no better evidence is available as to the subject matter being investigated).

Preliminarily, we note that the trial of the instant case occurred before the effective date of Chapter 8C of the North Carolina General Statutes, the codification of North Carolina Rules of Evidence. While under these new rules expert opinion of a defendant's ability to form specific intent to kill may be admissi-

ble evidence, in this opinion we are constrained to determine whether the trial court erred in applying the law of evidence as it existed at the time of trial. In the 1978 case of *State v. Wilkerson*, this Court remarked that:

> [I]n determining whether expert medical opinion is to be admitted into evidence the inquiry should be not whether it invades the province of the jury, but whether the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact. The test is as stated in *State v. Powell*, *supra*, 238 N.C. at 530, 78 S.E. 2d at 250, whether the "opinion required expert skill or knowledge in the medical or pathologic field about which a person of ordinary experience would not be capable of satisfactory conclusions, unaided by expert information from one learned in the medical profession."

295 N.C. 559, 568-69, 247 S.E. 2d 905, 911. *Accord, e.g., State v. Ford*, 314 N.C. 498, 334 S.E. 2d 765 (1985). Under the facts of the present case and under the law of evidence in effect at the time of trial, we hold that it was error to have permitted the state's expert to testify that, in his opinion, on the night of the murder defendant was able to form the specific intent to kill Ms. Phillips.

Although Dr. Rollins was an admitted expert in the field of forensic psychiatry, he examined defendant "sometime in September of 1983," some ten months after the killing. Beyond this examination, the length and scope of which are not identified in the record, his information concerning the events of the night of the crime was little different, if any, than that presented to the jury. In this respect the expert was in no better position than any lay juror when it came to determining whether defendant was able to form the specific intent to kill on the night of the murder. *See Com. v. Weinstein*, 499 Pa. 106, 118, 451 A. 2d 1344, 1350 (1982) ("The element of specific intent in the first degree murder statute is a legal construct which bears only a coincidental resemblance to psychiatric definitions of mental illness."). As several courts have acknowledged:

> "We do not quarrel with the notion that psychiatric testimony is of general relevance to the issue of responsibility.

. . . Care must be exercised, however, to distinguish such general relevancy from the unwarranted additional assumption that the psychiatric sciences are capable of direct proof of the existence of the necessary mental state as defined by law."

*Steele v. State*, 97 Wis. 2d 72, 94, 294 N.W. 2d 2, 12 (1980) (quoting *Bethea v. United States*, 365 A. 2d 64, 86 n.46 (D.C. 1976) ). In *Steele*, the Supreme Court of Wisconsin quoted the following remark with approval when ruling that psychiatric evidence of a defendant's specific intent to kill is neither competent, relevant, nor probative during the guilt phase of a murder trial: "In general, it is not at all apparent that psychiatrists know any more than does the layman about whether the defendant had an intent to kill when the act causing death was committed." 97 Wis. 2d at 95, 294 N.W. 2d at 12. This is in accord with the reasoning behind the relevant North Carolina case law in effect during the trial of this case, *State v. Matthews*, 226 N.C. 639, 39 S.E. 2d 819 (expert opinion testimony on whether criminal defendant had mental capacity to commit crime ruled inadmissible); *State v. Hauser*, 202 N.C. 738, 164 S.E. 114 (evidence that defendant had sufficient mental capacity to form plan of murder inadmissible). *See State v. Journegan*, 185 N.C. 700, 117 S.E. 27 (1923). *See generally* Annot., *Admissibility of Expert Testimony as to Whether Accused Had Specific Intent Necessary for Conviction*, 16 A.L.R. 4th 666, § 4[a] (1982).

We hold that the admission of Dr. Rollins' testimony with respect to defendant's specific intent was reversible error. Such an error would normally require that defendant receive a new trial. However, as the jury in this case found that defendant was guilty of murder in the first degree both under the theory of premeditation and deliberation and under the theory of felony murder, we set aside only the jury's finding that defendant is guilty of murder based on premeditation and deliberation. The verdict of guilty based on the felony murder rule remains unsullied. *See State v. Jerrett*, 309 N.C. 239, 307 S.E. 2d 339 (1983). Because the felony undergirding the felony murder theory in this case was the rape of Donna Phillips, we hereby arrest the judgment sentencing defendant for the crime of rape. *E.g., State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972).

We now turn to defendant's remaining assignments of error.

Defendant next argues that allowing Dr. Rollins to offer his opinion at the guilt-innocence phase of the trial that the defendant was able to form the specific intent to kill constituted a violation of the defendant's privilege against self-incrimination under the United States and North Carolina Constitutions. U.S. Const. amends. V and XIV; N.C. Const. art. I, § 23. As we have determined that this testimony was inadmissible on other grounds, we do not reach the issue of its constitutionality.

[2]  Defendant's next contention is that his confession was improperly admitted into evidence on the grounds that it was made after he had been illegally seized by law enforcement officers without probable cause, in violation of the fourth and fourteenth amendments to the United States Constitution. Defendant also maintains that all evidence discovered as a result of his confession is "fruit of the poisonous tree" and is therefore also inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed. 2d 441 (1963). *See, e.g., State v. Morgan*, 299 N.C. 191, 261 S.E. 2d 827, *cert. denied*, 446 U.S. 986, 64 L.Ed. 2d 844 (1980). The state argues that defendant had not been "seized" within the meaning of the fourth amendment's prohibition against unreasonable searches and seizures. We agree with the state's position and find no error in the trial court's denial of defendant's motion to suppress.

Defendant's argument is based largely on the case of *Dunaway v. New York*, 442 U.S. 200, 60 L.Ed. 2d 829 (1979), in which the United States Supreme Court held that police may not seize a person, transport him to a police station, and subject him to interrogation based upon a mere "reasonable suspicion" that he is in some way implicated in a crime. 442 U.S. at 216, 60 L.Ed. 2d at 838. In general, the Court said, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 442 U.S. at 207 n.6, 60 L.Ed. 2d at 832 n.6 (quoting *Terry v. Ohio*, 392 U.S. 1, 16, 20 L.Ed. 2d 889, 903 (1968) ). In other words, "[o]nly when [a police] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. at 20 n.16, 20 L.Ed. 2d at 905 n.16. *Accord United States v. Mendenhall*, 446 U.S. 544, 64 L.Ed. 2d 497 (1980). Certain narrowly prescribed invasions of an individual's liberty

have been permitted without the prerequisite of probable cause. *E.g., United States v. Brignoni-Ponce,* 422 U.S. 873, 45 L.Ed. 2d 607 (1975) (limiting questioning of those in car stopped by border patrol permitted without probable cause to arrest); *Terry v. Ohio,* 392 U.S. 1, 20 L.Ed. 2d 889 (weapons' search based on reason to believe detainee is armed and dangerous). However, "any further detention or search must be based on consent or probable cause." *Dunaway v. New York,* 442 U.S. at 212, 60 L.Ed. 2d at 835 (quoting *United States v. Brignoni-Ponce,* 422 U.S. at 882, 45 L.Ed. 2d at 617 (1975) ). Although the defendant in *Dunaway* had not been told he was under arrest, was not "booked," and would not have had an arrest record if the interrogation had proved fruitless, the Court found as a matter of law that Dunaway had been involuntarily detained and that "such differences in form must not be exalted over substance." 442 U.S. at 215, 60 L.Ed. 2d at 838.

The characterization of a seizure of a person by law enforcement officials was discussed further in *United States v. Mendenhall,* 446 U.S. 544, 64 L.Ed. 2d 497. There, the Court reemphasized that "[t]he question whether the respondent's consent to accompany the agents was, in fact, voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances . . . ." 446 U.S. at 557, 64 L.Ed. 2d at 511. The Court went on to state:

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See *Terry v. Ohio, supra,* at 19, n.16, 20 L.Ed. 2d 889, 88 S.Ct. 1868, 44 Ohio Ops 2d 383; *Dunaway v. New York,* 442 U.S. 200, 207, and n.6, 60 L.Ed. 2d 824, 99 S.Ct. 2248; 3 W. LaFave, Search and Seizure 53-55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

446 U.S. at 554-55, 64 L.Ed. 2d 509-10 (footnote omitted). In finding that respondent Mendenhall had not been seized by Federal Drug Enforcement Agency agents who approached her in a Los Angeles airport, the Court noted that Mendenhall was not informed that she must accompany officers but was merely asked if she would; neither threats nor a show of force was made by officers; defendant was twenty-two years old; the events took place in a public concourse; the officers wore no uniforms and displayed no weapons; and Mendenhall accompanied the agents voluntarily and in a spirit of apparent cooperation. Thus, the Court concluded, the possibility that she reasonably could have considered the police conduct to be coercive was minimal.

As in *Dunaway* and *Mendenhall*, the defendant in the case before us alleges that he was coerced into accompanying law enforcement officials and that he involuntarily submitted to what he considered to be custodial interrogation. At the suppression hearing, he testified that he did not think he had any choice about going downtown with the detectives because every time he was read his rights he went to jail. The test we must apply in determining whether the trial court was correct in concluding that defendant was not seized is not, however, whether defendant subjectively believed he was not free to go, but whether a reasonable person would have believed he was free to go. *State v. Davis*, 305 N.C. 400, 410, 290 S.E. 2d 574, 580-81 (1982). Upon an examination of all of the evidence that was before the trial court, we conclude that the trial court's determination that defendant was not seized within the meaning of the fourth amendment is amply supported by the evidence and is therefore binding upon appeal. *E.g., State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134 (1983); *State v. Chamberlain*, 307 N.C. 130, 297 S.E. 2d 540 (1982). The evidence supporting the trial court's finding includes the following testimony of defendant:

[ON DIRECT EXAMINATION]

Q. Tell us about the first time you talked to Detective Jacobs.

A. I was walking down High Point Road, Detective Jacobs approached me from the right. He showed me identification, told me his name, and *asked me* if I would accom-

pany him downtown to get a statement about a homicide. [Emphasis supplied.]

. . . .

Q. Did you agree to go downtown with him?

A. Yes sir.

. . . .

[ON CROSS-EXAMINATION]

Q. . . . And you don't have any recollection, then, as to whether or not you had any awareness as to whether or not your freedom of movement was restricted in any way; is that your testimony?

. . . .

A. From my understanding, everytime somebody has ever read me my rights, that meant I was going to jail.

. . . .

Q. [Y]ou thought, then, that you were placed under arrest out on High Point Road; is that right?

A. Yes sir.

Q. I see. And did Detective Jacobs tell you on that occasion that you were under arrest?

A. No.

Q. He didn't. You told Judge Albright that you saw a gun on that occasion; is that right?

A. Yes, to the best of my knowledge.

Q. I see. And did he point that gun at you?

A. No, sir.

Q. Did he had the gun in a holster?

A. No sir.

Q. Well, where was the gun when you saw it?

A. I believe it was under his jacket.

. . . .

Q. Tell Judge Albright what, if anything, Detective Jacobs did on that occasion to cause you to believe in your mind that if you didn't get in the car or if you turned away that he would shoot you.

A. I didn't say he would definitely shoot me, you know. He done told me, "We want to get a statement about a homicide." In my *law* [sic], if I would have refused or tried to leave, he would have probably pulled it on me.

Q. And that's what you expected he would do; is that right?

A. Yes, sir.

Q. Did he do anything on that occasion that led you to believe that he would do that?

A. No, sir. When he asked me, he wanted a statement about a homicide, that's what come to my mind.

Q. Well, of course, at that time you were somewhat nervous about being asked about any homicide because you knew what you had been involved in about twenty-four hours earlier, isn't that right?

. . . .

A. Yes sir.

. . . .

Q. [Y]ou were apprehensive about talking to them about anything because of what you knew you had been involved in?

. . . .

A. Yes, sir.

. . . .

Q. Well, did Detective Jacobs do anything to indicate to you that he was prepared to use force?

A. No, sir.

. . . .

Q. I'm asking what, if anything, did Detective Jacobs do on that occasion to cause you to believe that he was going to use force to put you in that car against your will?

A. Nothing . . . .

. . . .

Q. [Y]our recollection of what he said to you was that "I want to talk to you about a homicide"; is that right, Mr. Johnson?

A. No, sir. He wanted to get my statement about a homicide.

. . . .

Q. . . . . [T]he only thing that you're saying occurred is that he pulled up, identified himself as a Police officer —

A. Yes, sir.

Q. — told you he wanted to take a statement and told you to get in the car; is that right?

A. He asked me to get in the car.

Q. He asked you to get in the car. Well, did he ask you in a threatening manner?

A. No, sir.

. . . .

Q. And the fact of the matter is that you got in the car of your own free will; isn't that right?

A. Yes, sir.

. . . .

Q. Well, did either Detective Jacobs or Detective Dunevant talk to you in any kind of threatening manner?

A. No, sir.

Q. Were they hostile or angry or aggressive toward you?

A. No, sir.

State v. Johnson

Q. Did they treat you in any bad fashion, talk ugly to you, use any profanity?

A. No, sir.

. . . .

Q. And when you got out of the car, did either one of them put their hands on you?

A. No, sir.

Q. Did either one of them take you by the arm or — Did they even do that out on High Point Road?

A. No, sir.

Q. There was no touching you whatsoever, was there?

A. No, sir.

Q. All right. And when you got up to the Sheriff's Department, did they start ordering you around and start being aggressive towards you?

A. No, sir.

. . . .

Q. Now you're saying that the mere fact that you got a ride from High Point Road downtown, you thought you were under arrest; is that right?

. . . .

A. I didn't necessarily think it then, but I knew I was going to be under arrest.

. . . .

Q. Well, that was because you were concerned that whole period of time, were you not, that these officers were going to find out about your involvement in the death of Donna Phillips, right?

A. Yes, sir.

Q. And that was your conscience bothering you and it wasn't anything that any of these officers had done to you; isn't that right?

. . . .

A. Yes, sir.

Defendant further testified that before getting in the car he was not frisked; that he sat alone in the back seat of the unmarked car while the detectives rode in the front; that they did not ask him to empty his pockets nor did they frisk him in the interview room; that the detectives provided him with cigarettes and coffee; that he was allowed to go unescorted to the bathroom and to make two telephone calls; that he was left alone and unsupervised in the interview room; that the detectives questioning him never raised their voices, never talked in a loud, threatening manner, and never called him a liar. In addition, defendant aknowledged that he had been arrested several times previously, that he knew and fully understood what his rights were and that he waived them at the police station. The following dialogue also occurred between the prosecutor and the defendant during the suppression hearing. ·

Q. I will ask you if you didn't testify on Direct Examination that you said to them, "You either charge me or you let me go home"?

A. Yes.

Q. So, you knew that there weren't any charges pending against you at that time, right?

A. I didn't know if there was going to be any.

. . . .

Q. Now, you knew at that time that there weren't any charges pending against you, right?

A. Yes, sir.

Q. And you knew that you weren't under arrest; isn't that right?

(Pause.)

A. Yes sir.

. . . .

Q. You knew they didn't have any warrant, right?

A. Yes, sir.

Q. And you were calling their bluff, weren't you?

. . . .

A. Yes, sir.

Q. And you were trying to find out whether or not they had anything on you; isn't that right?

A. Yes, sir.

. . . .

Q. And up to that point in time, Mr. Johnson, nobody had even accused you of the murder, had they?

A. No, sir.

Q. Not one officer had even implied to you that you were involved in the murder, only that you and Jerry had given the girl a ride and were the last people that the State knew about that had seen her alive; isn't that right?

A. Yes, sir.

Additional evidence supporting our conclusion includes the facts that Johnson was told several times that he would be brought home and that once he arrived at the station the interview room door was never locked.

The facts in the instant case are similar to those in *State v. Simpson*, 303 N.C. 439, 279 S.E. 2d 542 (1981). In *Simpson*:

The evidence presented indicated that as part of an investigation into the homicide of Willie Kinlaw, Philadelphia Police Detective Daniel Rosenstein went to the Wyneva Hotel in Philadelphia on the morning of 12 April 1976 to locate defendant for questioning. Upon finding defendant at the hotel the officers requested that he come to the Police Administration Building to answer questions concerning the Fayetteville murder. Defendant agreed to accompany the officers and was driven to the Police Administration Building in a police vehicle, arriving at approximately 9:15 a.m. He was taken to an interrogation room and left alone until 9:30 a.m., at which

time Detective Rosenstein advised him of his constitutional *Miranda* rights. Several officers testified that defendant was not locked in the interrogation room or deprived of his liberty in any way at this time; he was free to leave upon request. Defendant was again informed of his constitutional rights at about 10:10 a.m., after which he was interviewed by Detective Rosenstein and two officers of the Fayetteville Police Department until 11:25 a.m. At that time, defendant requested and was allowed to use the bathroom, and was subsequently questioned until 1:25 p.m. Defendant was then offered food, which he refused, and was questioned until 2:45 p.m. During these interviews defendant continued to deny any participation in or knowledge of the murder of Willie Kinlaw. He was not handcuffed, arrested, or restrained of his liberties during this time. Defendant then accompanied officers to a cafeteria located within the building, returning to the interrogation room at about 3:10 p.m. He then signed a form consenting to a search of his hotel room, and signed a typewritten transcript of his exculpatory statements at approximately 5:15 p.m. The officers continued to interview defendant until 7:00 p.m., at which time defendant requested and was furnished drinking water.

303 N.C. at 444, 279 S.E. 2d at 545-46. Sometime later Simpson was formally arrested pursuant to a warrant. In rejecting Simpson's claim that for purposes of fourth amendment analysis he had been "arrested" when asked to accompany officers for questioning, this Court stated:

In the present case, there is competent evidence which indicates that defendant voluntarily agreed to accompany law enforcement officers to the Police Administration Building on the morning on [sic] 12 April 1976. The officers did not frisk or handcuff defendant at that time. Defendant was not subjected to any physical contact with the officers until after he had made an incriminating statement. During his interrogation the officers honored each of defendant's requests for food, water, or the use of the bathroom facilities. He was not treated as though he was incarcerated. Several officers testified that had defendant asked to leave before Officer Dupe informed them that he had a warrant for defendant's arrest, he would have been allowed to go as he pleased. Thus, there is

sufficient evidence in the record to support the trial judge's conclusion that defendant was not under arrest until Officer Dupe appeared with a warrant for his arrest, and defendant's contentions to the contrary are without merit.

*Id.* at 445-46, 279 S.E. 2d at 546-47. Such is also true in the instant case.

We recognize that Detective Jackson's statement to defendant that "I just wanted to meet a cold-blooded killer," when viewed in isolation, might lead one to believe he was indeed under arrest and not free to go. However, considering the totality of the circumstances, this one statement by Jackson does not alter the voluntary nature of defendant's initial consent to accompany officers and to be questioned. For example, in *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574, a similarly situated defendant was shown photographs of the crime scene including several of the body of the deceased. Davis indicated that he could not look at the photographs, stated that he did not want to discuss the case, and began to cry. Police declined to remove the photographs and defendant subsequently made a confession. We ruled this confession constitutional. In an even more difficult case, *State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134, police presented a cooperative interviewee with falsified evidence until they elicited a confession. This confession was also determined admissible by this Court. In each case one might argue that the police conduct displayed a varying "quality of purposefulness" which was undertaken "in the hope that something might turn up." *Dunaway v. New York*, 442 U.S. at 218, 60 L.Ed. 2d at 839 (quoting *Brown v. Illinois*, 422 U.S. 590, 605, 45 L.Ed. 2d 416, 428 (1975)). Yet in each situation the defendant voluntarily spoke with law enforcement officials after having voluntarily accompanied them to law enforcement facilities.

Similarly, in the present case we hold that under all the circumstances defendant was not deprived of his freedom or restrained in such a manner as to constitute being seized for purposes of fourth amendment analysis. The trial court properly admitted defendant's confessions.

[3] Defendant next argues that he was denied due process when the trial court denied his motion to continue his trial in the face of allegedly prejudicial pretrial publicity. Defendant's motion was

filed in response to the publication of two articles in Greensboro newspapers which revealed that during the suppression hearing on his confession which was held one day before the selection of the jury, defense counsel had offered to have defendant plead guilty in exchange for a lengthy term of imprisonment in an effort to avoid a possible death sentence. The first article, headlined "Johnson's Attorneys Offered To Have Him Make Guilty Plea," appeared the afternoon before jury selection. The second was published on the following morning and was entitled, "Defense Team Judged Plea of Guilty Wise." Defendant argues that the content and timing of the articles require this Court to assume the existence of prejudice because several potential jurors admitted having read them and were questioned about the articles' content before the entire venire panel. Of the potential jurors who read the articles and who were not dismissed for cause, three were ultimately accepted for the petit jury after having denied that their exposure would affect their impartiality. For the following reasons, we reject defendant's contention that he is entitled to a new trial under these circumstances.

It is elemental that "due process requires that the accused receive a trial by an impartial jury free from outside influences." *State v. Boykin*, 291 N.C. 264, 269, 229 S.E. 2d 914, 917 (1976) (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 362, 16 L.Ed. 2d 600, 620 (1966)); *State v. Jerrett*, 309 N.C. 239, 307 S.E. 2d 339. "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *State v. Richardson*, 308 N.C. 470, 478, 302 S.E. 2d 799, 804 (1983) (quoting *Sheppard*, 384 U.S. at 363, 16 L.Ed. 2d at 620). It is also well settled that the trial court's decision will not be disturbed on appeal unless defendant shows a gross abuse of discretion by the trial court. *State v. Gardner*, 311 N.C. 489, 497, 319 S.E. 2d 591, 598 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369 (1985); *State v. Dobbins*, 306 N.C. 342, 344, 293 S.E. 2d 162, 164 (1982). The burden is on the defendant to show "so great a prejudice . . . that he cannot obtain a fair and impartial trial." *Richardson*, 308 N.C. at 478, 302 S.E. 2d at 804 (quoting *Boykin*, 291 N.C. at 269, 229 S.E. 2d at 917-18).

Defendant first points out that unlike most cases involving alleged prejudicial pretrial publicity, he moved not for a change of

venue but only for a continuance. He maintains that a continuance constitutes a lesser intrusion upon the judicial process and upon the recognized interests of local citizens in the administration of justice than does a change of venue and argues that the showing necessary to mandate the granting of a continuance should, then, be lower than that requiring a change of venue. We disagree. As *Sheppard,* 384 U.S. 333, 16 L.Ed. 2d 600, and *Richardson,* 308 N.C. 470, 302 S.E. 2d 799, illustrate, a continuance and change of venue have traditionally been recognized as alternative responses to adverse pretrial publicity. The appropriateness of each varies depending on the situation, but each is triggered by the same level of potential danger and the granting of each is left to the sound discretion of the trial judge. We see no reason why the standard to be met should not be the same for each.

We also do not agree that the trial court erred under the traditional standard of review. Our cases illustrate that for defendant to prevail on the grounds that pretrial publicity precluded him from receiving a fair trial, he must first "show that jurors have prior knowledge concerning the case, that he exhausted peremptory challenges and that a juror objectionable to the defendant sat on the jury." *State v. Jerrett,* 309 N.C. 239, 255, 307 S.E. 2d 339, 348; *State v. Dobbins,* 306 N.C. 342, 293 S.E. 2d 162; *State v. Harrill,* 289 N.C. 186, 221 S.E. 2d 325, *death sentence vacated,* 428 U.S. 904, 49 L.Ed. 2d 1211 (1976). Of these factors, defendant has not shown that a juror objectionable to defendant sat on the jury. In his brief defendant does note that three of the jurors who were seated and decided the case indicated that they had read the newspaper articles at issue here. However, after thorough examination of the jurors passed on by the state and defense counsel, both defense counsel and the defendant personally stated affirmatively that they were satisfied with the jury as chosen. The alternate jurors selected were also passed upon without objection by defendant or his counsel. Because defendant has failed to show that an objectionable juror decided his case, defendant has not met the threshold test noted above.

Further, we do not accept defendant's contention that we must nevertheless assume prejudice given the content of the articles in question. In determining the existence of prejudice, it is significant but not dispositive that a juror has been exposed to information which would be inadmissible at trial. *Cf., e.g., State v.*

*Oliver,* 302 N.C. 28, 274 S.E. 2d 183 (1981), *appeal on other grounds,* 309 N.C. 326, 307 S.E. 2d 304 (1983); *Dobbins,* 306 N.C. at 345, 293 S.E. 2d at 164 (no abuse of discretion in denying motion for a change of venue when pretrial publicity consists of factual accounts of pretrial proceedings and the commission of the crime). In the present case, it is particularly significant that the seated jurors who had read either or both of the articles had stated unequivocally that their prior exposure would not affect their ability to determine defendant's guilt or innocence based solely on the evidence introduced at trial. *Richardson,* 308 N.C. at 480, 302 S.E. 2d at 805. Under these circumstances we therefore conclude that defendant has failed to show that the trial judge abused his discretion in denying defendant's motion to continue.

[4] The next argument advanced by defendant is that the trial court erred in refusing to dismiss the charges of rape and kidnapping at the close of all the evidence because the state failed to establish the corpus delicti of either crime.

As stated in *State v. Franklin,* 308 N.C. 682, 693, 304 S.E. 2d 579, 586 (1983), "[t]he corpus delicti rule is based on the hesitancy of the law to accept, without adequate corroboration, the extrajudicial confession of a defendant and to avoid convicting a person, solely out of his own mouth, of a crime that was never committed or was committed by someone else." Until recently, in North Carolina the corpus delicti rule entailed that " 'a conviction cannot be sustained upon a naked extra-judicial confession.' . . . Even though the defendant's confession identifies him as the person who committed the [crime], the State must first establish the *corpus delicti* . . . ." *State v. Brown,* 308 N.C. 181, 183, 301 S.E. 2d 89, 90 (1983) (citations omitted). The corpus delicti rule therefore required the state to offer into evidence "sufficient extrinsic corroborative circumstances as will, when taken in connection with an accused's confession, show that the crime was committed and that the accused was the perpetrator . . . ." *State v. Thompson,* 287 N.C. 303, 324, 214 S.E. 2d 742, 755 (1975), *death sentence vacated,* 428 U.S. 908, 49 L.Ed. 2d 1213 (1976); *State v. Cope,* 240 N.C. 244, 81 S.E. 2d 773 (1954).

In our recent case of *State v. Parker,* 315 N.C. 222, 337 S.E. 2d 487 (1985), however, this Court held that

in non-capital cases . . . when the State relies upon the defendant's confession to obtain a conviction, it is no longer

necessary that there be independent proof tending to estab-
lish the *corpus delicti* of the crime charged if the accused's
confession is supported by substantial independent evidence
tending to establish its trustworthiness, including facts that
tend to show the defendant had the opportunity to commit
the crime.

*Id.* at 236, 337 S.E. 2d at 495. Although the rule in *Parker* was ex-
pressly limited to noncapital cases, the facts in the instant case do
not require us to decide whether the *Parker* rule applies in capi-
tal cases. In *State v. Trexler*, 316 N.C. 528, 532, 342 S.E. 2d 878,
880 (1986), we determined that "[t]he pre-*Parker* rule is still fully
applicable in cases in which there is some *evidence aliunde* the
confession which, when considered with the confession, will tend
to support a finding that the crime charged occurred."

In the case sub judice, the pre-*Parker* rule applies because
there is some evidence *aliunde* defendant's confession tending to
support a finding that the rape and kidnapping occurred. Concern-
ing the kidnapping conviction, the testimony of Cheryl Cassaro
establishes that Donna Phillips had asked for a ride from the
Rock to her car. The last Ms. Cassaro saw of the victim was when
Ms. Phillips was let out on the side of the road, having expressed
her desire and intention to go home. The facts that Ms. Phillips'
body was found on a narrow road miles from her home, her car,
the place where she was let out, and the bar from which they all
started, that bloodstains were found in the car and on defendant's
clothing, and that bruises were found on Ms. Phillips' face, clearly
corroborate defendant's admission that he and Williams picked up
the victim, forcibly restrained her, and transported her away
from town against her will.

With regard to the first-degree rape charge, in addition to
the stab wounds there was a bruise on the victim's face and bite
marks over her left breast and thigh. The pattern of bloodstains
in the car suggests that she was dragged out of it. Her clothes
were found pulled and torn in a fashion which left her body ex-
posed from her neck to her ankles. The small amount of semen
found in her vagina was consistent with defendant's statement
that he penetrated Ms. Phillips but did not complete ejaculation.
The fact that defendant possessed a knife with traces of blood on
it which could have produced the stab wounds corroborates his

admission that the knife was the one he used to stab Ms. Phillips. We hold that there was sufficient extrinsic evidence admitted at trial to support the jury's findings that the kidnapping and rape occurred in the instant case.

[5] Next, defendant contends that the trial court violated the Speedy Trial Act, N.C.G.S. 15A-701 to -704, by refusing to grant his motion to dismiss for failure to begin the trial within 120 days from the date of indictment.

The Speedy Trial Act provides that "[t]he trial of the defendant charged with a criminal offense shall begin . . . [w]ithin 120 days from the date the defendant is arrested, served with criminal process, waives an indictment, or is indicted, whichever occurs last." N.C.G.S. § 15A-701(a1)(1) (1983). Additionally, statutorily enumerated and judicially recognized periods of exclusion will be factored out of any computation. *State v. Marlow*, 310 N.C. 507, 514, 313 S.E. 2d 532, 537 (1984). These periods include any delay resulting from a mental examination of defendant, N.C.G.S. 15A-701(b)(1)(a), hearings on any pretrial motions, N.C.G.S. 15A-701(b)(1)(d), and any "delay resulting from a defendant's request for discovery." *Marlow*, 310 N.C. at 515, 313 S.E. 2d at 537. Thus,

> the statutory time, within which the trial of a criminal case must begin, must cease to run until the occurrence of the earlier of the following events: (1) the completion of the requested discovery; (2) the filing by the defendant of a confirmation of voluntary compliance with the discovery request; or (3) the date upon which the court, pursuant to N.C. Gen. Stat. § 15A-909, has determined that discovery would be completed.

*Id.* at 515, 313 S.E. 2d at 538.

Defendant was indicted on 3 January 1983. He does not dispute his unavailability for trial while he was being examined at Dorothea Dix Hospital for a period of thirty-five days. Thus, we need only consider that period of time in which the state sought to comply with defendant's discovery request in order to conclude that defendant was tried within 120 days of indictment. On 17 January 1983, defendant wrote a discovery letter to the district attorney and personally served it on him on 19 January 1983. The

state responded to defendant's discovery request in a complete fashion in a letter dated 15 July 1983 and filed 19 July 1983, and defendant does not argue that discovery had been or reasonably should have been completed earlier. According to defendant's own calculation, then, the Speedy Trial Act was tolled for a period of 179 days, leaving a time period well within 120 days between defendant's 3 January indictment and his 3 October trial date. We do not consider defendant's urging that we reconsider *Marlow* warranted and, accordingly, this assignment of error is overruled.

[6] Defendant next argues prejudicial error in the trial court's allowing the introduction of plaster casts of defendant's teeth and of indentations on the deceased's left breast and in further allowing a demonstration of how the cast of defendant's teeth matched the bite marks by simulating its biting action against the breast cast. Defendant bases his argument on the fact that he did not dispute that he bit Ms. Phillips and therefore the introduction and display of this demonstrative evidence served to deprive him of his right to due process on the grounds that its prejudicial effect outweighed its probative value.

It is generally accepted that relevant evidence will not be excluded simply because it may also tend to prejudice a defendant. Such evidence is properly excluded only where it is completely lacking in probative value or, if probative, its value is outweighed by its prejudicial effect. *E.g., State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Swift,* 290 N.C. 383, 226 S.E. 2d 652 (1976) (teeth found at crime scene); *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889 (1963). The evidence in the present case was clearly admissible. The evidence was relevant for the purpose of showing whether Ms. Phillips had been the victim of a violent sexual attack and whether it was defendant who had inflicted the injury. The evidence also corroborated defendant's confession. *See State v. Trexler,* 316 N.C. 528, 342 S.E. 2d 878. In this regard defendant is in error when he suggests that by failing to contest facts contained in his extrajudicial confession he may preclude the introduction of additional corroborative evidence. We hold that the probative value of the evidence at issue outweighed any prejudicial effect it may have had and that it was properly admitted at trial.

[7] Defendant next sets forth several assignments of error concerning the "death qualification" procedure of potential jurors.

*See Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776 (1968). Defendant first contends that death qualification is unconstitutional, arguing that a death-qualified jury is more conviction prone than a non-death-qualified jury and therefore its use deprived him of his rights under the sixth, eighth, and fourteenth amendments to the Constitution of the United States. The practice of "death qualifying" the jury in a capital case has recently been held to violate neither the United States Constitution, *Lockhart v. McCree*, 476 U.S. 162, 90 L.Ed. 2d 137 (1986), nor article I, section 19 of the North Carolina Constitution, *State v. Barts*, 316 N.C. 666, 343 S.E. 2d 828 (1986). *Accord, e.g., State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, 469 U.S. 963, 83 L.Ed. 2d 299 (1984). Accordingly, we overrule this assignment of error.

[8]  Defendant also contends that he was prejudiced by the exclusion of one potential juror, Mrs. Harrison, who expressed a clear refusal to invoke the death penalty and who was therefore successfully challenged for cause by the state before defendant was given the opportunity to question her. In effect, defendant maintains that he should have been allowed to "rehabilitate" this potential juror through additional voir dire. We adhere to our prior rejections of this argument, *State v. Smith*, 291 N.C. 505, 231 S.E. 2d 663 (1977); *State v. Bock*, 288 N.C. 145, 217 S.E. 2d 513 (1975), *death sentence vacated*, 428 U.S. 903, 49 L.Ed. 2d 1209 (1976), on the grounds that when a potential juror has expressed a clear and unequivocal refusal to impose the death penalty under all the circumstances, any additional cross-examination by defense counsel "would thwart the protective purposes of N.C.G.S. 9-21(b) [and] would be a purposeless waste of valuable court time . . . ." *Bock*, 288 at 156, 217 S.E. 2d at 520. We reject defendant's argument.

Defendant alternatively argues that this same potential juror, Mrs. Harrison, was improperly excused for cause in violation of *Witherspoon*, because although she ultimately expressed an ineluctable commitment to vote against a penalty of death in all circumstances, she initially expressed some doubt as to whether she would follow the law of sentencing. Applying the standard set forth in *Wainwright v. Witt*, 469 U.S. 412, 83 L.Ed. 2d 841 (1985), which allows a prospective juror to be excluded for cause if the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his in-

structions and his oath," *id.* at 424, 83 L.Ed. 2d at 851-52, we find that Mrs. Harrison's exclusion was proper. As defendant correctly asserts, one must consider the entire examination of a potential juror contextually. *E.g., Darden v. Wainwright,* --- U.S. ---, 54 U.S.L.W. 4734 (filed 23 June 1986); *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982). Our review of the record reveals that Mrs. Harrison initially stated that her views on capital punishment would not affect her ability to reach a decision at the guilt-innocence phase of the trial. She then indicated that she would not, under any circumstances, later vote to impose the death penalty at the sentencing phase. Upon further examination she equivocated, but this hesitation was clearly based on her uncertainty regarding her role as a juror in following the instructions of the trial judge. This confusion was clarified in the following exchange during which Mrs. Harrison adequately revealed the basis for the successful challenge against her:

> MR. COMAN: All right. So, you're saying, then, that if the State proved these factors beyond a reasonable doubt and you listened to the instructions of law from the Judge and if you found beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors and that the death penalty was appropriate, you could return a verdict of death penalty; is that right?
>
> MRS. HARRISON: Un-hun. No, no.
>
> MR. COMAN: You couldn't?
>
> MRS. HARRISON: No.
>
> MR. COMAN: Okay. Are you saying that you could never return a verdict of the death penalty —
>
> MRS. HARRISON: No.
>
> MR. COMAN: —regardless of any circumstance?
>
> MRS. HARRISON: That's right.
>
> MR. COMAN: Did you say "That's right"?
>
> MRS. HARRISON: Uh-huh.

In light of the unequivocal nature of Mrs. Harrison's initial and final statements that she would refuse to follow the law and im-

pose the death penalty regardless of the circumstances, we find that she was properly excluded under the *Wainwright* standard. Her temporary confusion does not support defendant's contention that she was impermissibly removed from the panel.

[9]   Nor was another juror, Miss Rumley, improperly excused for cause. In examining Miss Rumley, the prosecution never reached the issue of her views on imposing the death penalty. To the contrary, Miss Rumley was excused because after a thorough examination she said she did not believe that she could, in the words of the prosecutor, "pass judgment on another human being" or "render a verdict with respect to the charge in accordance with law." Miss Rumley was therefore properly excluded under N.C.G.S. § 15A-1212(8) and (9) which provide that a challenge for cause to an individual juror is justified if that potential juror "[a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina," or "[f]or any other cause is unable to render a fair and impartial verdict." There was no error in dismissing Miss Rumley for cause as she clearly expressed that she felt herself unable to determine the guilt of another regardless of the circumstances.

[10]   Defendant's next two assignments of error address the procedures by which the state compiled the jury list from which defendant's grand and petit juries were drawn. Defendant made and the trial court denied a motion to quash based upon the failure of the Guilford County Jury Commission to comply with statutory procedures which allegedly resulted in a jury underrepresenting blacks. Defendant alleges that he was thereby denied his constitutional right to trial by an impartial jury composed of a fair cross-section of the community.

Specifically, defendant contends that the Guilford County Jury Commission did not comply with the procedures mandated by sections 9-1 and -2(c) of our General Statutes. N.C.G.S. § 9-1 requires that the jury commission in each county consist of three persons who shall serve two-year terms. In this case, one of the three duly appointed commissioners was murdered on 20 November 1981, four days before the Commission was required to submit a new list of potential jurors qualified to serve in the biennium governing the instant case. Because of the imminent

deadline for submitting the list of names, the remaining two members of the jury commission decided to proceed without waiting for a replacement for the deceased commissioner. N.C.G.S. § 9-2(c) requires that all jury lists prepared on or after 1 July 1983 include as a source of names the list of licensed drivers residing in the county for which the jury list is being prepared. The data base adopted by the Commission in this case did not include the list of licensed drivers residing within the county. The trial court found that at its 23 November 1981 meeting the Commission had voted to incorporate this list into the data base but was prevented from so doing because of the immediate unavailability of computer software compatible with the Guilford County computer system. As a result, the pool for the entire biennium beginning 1 January 1982 was derived solely from the county's voter registration list.

We do not agree that these alleged statutory irregularities tainted the process by which the jury list used in this case was prepared. This Court has held that deviations from the statutory norm do not automatically constitute reversible error absent an express statutory provision to the contrary. *State v. Vaughn,* 296 N.C. 167, 175, 250 S.E. 2d 210, 215 (1978), *cert. denied,* 441 U.S. 935, 60 L.Ed. 2d 665 (1979). *See Carter v. Jury Commission,* 396 U.S. 320, 24 L.Ed. 2d 549 (1970) (states are free to formulate reasonable requirements for juror qualification); *Taylor v. Louisiana,* 419 U.S. 522, 42 L.Ed. 2d 690 (1975) (same). In order to justify a motion to quash an indictment upon grounds that statutory procedures were violated in the compilation of the jury list, a party must show corrupt intent, systematic discrimination in the compilation of the list, or irregularities which affect the actions of the jurors actually drawn and summoned. *Vaughn,* 296 N.C. at 175, 250 S.E. 2d at 215. Because he failed to present any evidence that the two-person Commission acted with corrupt intent, or that the use of a two-person instead of three-person commission resulted in either systematic discrimination in the compilation of the jury list or irregularities which affect the actions of the jurors actually drawn and summoned, defendant has not met his burden of proof with respect to his motion based on N.C.G.S. § 9-1.

We also reject defendant's argument based on the Commission's alleged failure to comply with N.C.G.S. § 9-2(c). N.C.G.S.

§ 9-2(c) was not in effect at the time the jury list used in the instant case was compiled. N.C.G.S. § 9-2(a) and (c) provide:

> (a) It shall be the duty of the jury commission beginning July 1, 1981, (and each biennium thereafter) to prepare a list of prospective jurors qualified under this Chapter to serve in the biennium beginning January 1, 1982, (and each biennium thereafter). Instead of providing a list for an entire biennium, the commission may prepare a list each year if the senior regular resident superior court judge requests in writing that it do so.

> (c) Effective July 1, 1983, the list of licensed drivers residing in each county, as supplied to the county by the Division of Motor Vehicles pursuant to G.S. 20-43.4, shall also be required as a source of names for use by the commission in preparing the jury list.

In accord with N.C.G.S. § 9-2(a), the jury list for Guilford County for the biennium beginning 1 January 1982 was compiled 23 and 24 November 1981. At this time N.C.G.S. § 9-2(c) was not in effect, and therefore the Commission was not required to use as a source of names the list of licensed drivers residing in Guilford County. As the trial in the instant case began in October 1983, the jurors who served were chosen from the jury list prepared for the biennium beginning 1 January 1982. There was no irregularity and no violation of N.C.G.S. § 9-2 in this procedure.

Having discussed the statutory grounds for defendant's assignment of error, we now turn to the argument that the procedures used for selection of the jury venire in this case violated defendant's constitutional right to a jury composed of a fair cross-section of the community.

The United States Supreme Court has held that in order to establish a prima facie violation of the sixth amendment fair cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 58 L.Ed. 2d 579, 587 (1979); *State v. Avery,* 315 N.C. 1, 337 S.E. 2d 786 (1985); *State v. Adcock,* 310 N.C. 1, 310 S.E. 2d 587 (1984); *State v. Price,* 301 N.C. 437, 272 S.E. 2d 103 (1980). As to the first prong of the *Duren* test, there is no doubt that "blacks are cognizable as a distinctive group for the purposes of fair cross-section analysis." *Price,* 301 N.C. at 446, 272 S.E. 2d at 109. Defendant has failed, however, to establish either of the remaining elements.

Concerning the second prong, the record reveals that blacks represented 25.4 percent of the population of Guilford County, but only 14.6 percent of the disputed venire, which was drawn from the county's voter registration list. The motor vehicles registration list, defendant insists, is more highly representative of the county's black population. Although in this case the difference of 10.8 percentage points on an absolute scale is disparate, *Price,* 301 N.C. at 447, n.2, 272 S.E. 2d at 110 n.2 (stating it is appropriate to consider absolute rather than comparable disparity), we do not consider this figure to be unfair or unreasonable. "[A] criminal defendant is not entitled to a jury of any particular composition, nor is he entitled to be tried before a jury which mirrors the presence of various and distinctive groups within the community." *Id.* at 448, 272 S.E. 2d at 110-11 (citing *Apodaca v. Oregon,* 406 U.S. 404, 32 L.Ed. 2d 184 (1972) ). An analysis of earlier cases clearly indicates that the present figures are within the permissible range. *See, e.g., State v. Avery,* 315 N.C. 1, 337 S.E. 2d 786 (9.6 percent deviation); *State v. Adcock,* 310 N.C. 1, 310 S.E. 2d 587 (absolute disparity of 7.8 percent); *Price,* 301 N.C. 437, 272 S.E. 2d 103 (1980) (no error as a matter of law where blacks, representing 31.1 percent of the county population, made up only 17.1 percent of the applicable jury pool); *State v. Avery,* 299 N.C. 126, 261 S.E. 2d 803 (1980) (entire black population of 24 percent compared with a 15 percent representation within the jury pool permissible).

As to the third prong of the *Duren* test, defendant has failed to show that the jury commission's actions were representative of a systematic exclusion of blacks from the jury process. There is no evidence that by not using lists of licensed drivers the Commission intended systematically to exclude blacks from the jury list. Further, defendant has failed to include comparable data from other years which would aid in an evaluation of the alleged

systematic nature of the underrepresentation. In fact, even the racial composition of defendant's own jury does not appear in the record. We therefore hold that defendant has not met his burden of proving that there has been any violation of constitutional principles in the preparation of the jury list used in this case.

[11] Defendant next argues that during the voir dire examinations of prospective jurors the trial court committed error in not permitting defendant to ask the potential jurors how they gauged the importance of the parent-child relationship and whether they could consider evidence of child abuse as a mitigating circumstance for sentencing purposes. The record shows that defense counsel asked the first twelve juror candidates the following question:

> Ladies and gentlemen of the Jury, if the evidence in this case shows you that Bobby Ray Johnson did not have a good relationship with his parents and was, in fact, an abused and neglected child, could you all consider that evidence in determining the sentence in this case if we get to the sentencing phase of the case?

After the state's objection to this question was sustained, defense counsel was nevertheless permitted to ask, over the state's objection, if "any member of this panel [has] ever worked with or been involved with abused or neglected children."

We find defendant's assignment of error to be groundless. Although wide latitude is given counsel in voir dire examination of jurors, the form and extent of the inquiry rests within the sound discretion of the court. *E.g., State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398 (1983); *State v. Banks*, 295 N.C. 399, 245 S.E. 2d 743 (1978). "[I]n order for a defendant to show that the court's regulation of jury selection constitutes reversible error, he must establish both that the trial judge abused his discretion and that he suffered prejudice as a result of such abuse." *Banks*, 295 N.C. at 407, 245 S.E. 2d at 749. In the case before us defendant has shown neither. First, defendant was allowed to pose a similar question to potential jurors which would have elicited much of the information defendant desired to obtain on that issue. Second, at the conclusion of the sentencing phase the jurors found the existence of at least one mitigating circumstance, and among those submitted for

their consideration were that "defendant was abused and neglected as a child" and "defendant came from a broken home." Finally, the first question of defense counsel was properly struck on the grounds that it constituted an impermissible hypothetical question "designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts." *State v. Vinson*, 287 N.C. 326, 336, 215 S.E. 2d 60, 68 (1975), *death sentence vacated*, 428 U.S. 902, 49 L.Ed. 2d 1206 (1976).

[12] Defendant next argues that the trial court erred in overruling defendant's objection to the prosecutor's reference to Jerry Williams and his status as a codefendant. During the state's voir dire examination of the jury, the district attorney asked: "And do you understand that the comments that you heard in the courtroom previously that there is a codefendant who is also charged with first degree murder, first degree rape, kidnapping, and that his case is separate from this defendant's [and] will be heard by another jury—." Defendant first makes the argument that this pretrial statement was factually inaccurate for the reason that after defendant's trial was concluded Williams pled guilty under a plea agreement with the state. According to defendant, this inaccuracy required the trial court to give a cautionary instruction to the entire panel. This assignment of error lacks merit. This case is not one where jury members had been told that potential codefendants had already pled guilty to the same charge. *E.g., State v. Campbell*, 296 N.C. 394, 250 S.E. 2d 228 (1979) (evidence of guilt of codefendant not competent evidence of guilt of defendant); *State v. Atkinson*, 25 N.C. App. 575, 214 S.E. 2d 270 (1975). *But see State v. Rothwell*, 308 N.C. 782, 303 S.E. 2d 798 (1983) (evidence of a testifying codefendant's guilty plea is admissible if introduced for a legitimate purpose). *Accord State v. Marlow*, 310 N.C. 507, 313 S.E. 2d 532. Nor is this a case where a deadlocked jury was improperly told that another jury may have to decide this case. *State v. Easterling*, 300 N.C. 594, 268 S.E. 2d 800 (1980). The comment in this case in no way suggested that defendant was guilty, nor did it have the potential to affect the jury's deliberation process. Moreover, before the court ruled on defendant's objection to the prosecutor's remark, the prosecutor was allowed to finish the remark by adding "and that, therefore, the matters that will be before this jury relate only to Bobby Johnson and the

matter of the co-defendant should not be a matter for this jury's concern." Even assuming arguendo that the trial court erred in failing to sustain defendant's objection, defendant has completely failed to show that a different result would have been reached in the absence of this alleged error. *See* N.C.G.S. § 15A-1443(a) (1983). We reject defendant's assignment of error.

[13] Defendant next contends that the trial court erred in failing to instruct the jury on intoxication by drugs. Under N.C.G.S. § 15A-1232 it is the duty of the court to instruct the jury on all substantial features of a case, but this duty extends only to those features which are raised by the evidence. *State v. Brock*, 305 N.C. 532, 290 S.E. 2d 566 (1982); *State v. Jones*, 300 N.C. 363, 266 S.E. 2d 586 (1980). There is no evidence which supports defendant's assertions that he was under the influence of "dust" ("angel dust"), or PCP, on the night of the murder. Defendant can only refer to one letter he had written to his girlfriend which contained the following statements: "Lucy, moma got drunk and I took some money out of her pocketbook the night before. That's how I bought the dust." This letter does not indicate that defendant consumed this "dust" or was under its influence at the time of the murder. Neither did Ms. Cassaro nor defendant, through his confession, ever assert that he had consumed anything other than alcohol. Moreover, defendant was given the benefit of a general instruction to the jury on the issue of voluntary intoxication as it related to the elements of premeditation and deliberation in the crime of murder in the first degree. There was no error in the trial judge's decision that a specific instruction on intoxication by drugs was not required.

[14] Defendant next alleges that the trial judge effectively denied him a fair trial by improperly conveying an opinion of defendant's guilt while instructing the jury on possible verdicts appropriate to the case. N.C.G.S. § 15A-1232 (1983). In support of his argument defendant specifically contends that Judge Albright unduly emphasized the state's evidence on the rape charge and the first degree murder response on the verdict form by repeatedly reciting one portion of the facts. While applying the facts to possible verdicts of felony murder, rape in the first degree, and attempted rape in the first degree, the court repeated, with minor variations, that such charges may be appropriate if the jury found that the defendant "engaged in vaginal intercourse

with Donna Phillips and that he did so by hitting her with his fists, stabbing her with a knife, commanding her to get on the ground, forcibly tearing or cutting her bra and pulling her pants and undergarments down and biting her breast and that this was sufficient to overcome any resistance . . . ." Defendant insists that the court went beyond what was necessary in applying the law of rape in the first degree to the evidence and that the court's actions in "unduly stressing" this evidence served to indirectly convey an opinion that defendant was guilty. We disagree.

N.C.G.S. 15A-1232 provides that a judge is forbidden from expressing an "opinion whether a fact has been proved." *See, e.g., State v. Staley,* 292 N.C. 160, 232 S.E. 2d 680 (1977); *State v. Freeman,* 280 N.C. 622, 187 S.E. 2d 59 (1972); *State v. Morrison and State v. Templeton,* 63 N.C. App. 125, 303 S.E. 2d 849 (1983). This statute does not, however, attempt to enforce the guarantee of impartiality required of every judicial officer by precluding a thorough application of the facts to the law in the court's charge to the jury. N.C.G.S. § 15A-1232 provides that the judge "is not required to state the evidence except to the extent necessary to explain the application of the law to the evidence." *Cf. State v. Hewett,* 295 N.C. 640, 247 S.E. 2d 886 (1978). Upon contextually examining the court's statement, we find no expression of opinion by the trial court. This assignment of error is overruled.

## II. SENTENCING PHASE

**[15]** Defendant concedes that his constitutional challenges to the North Carolina death penalty statutes, N.C.G.S. §§ 15A-2000 to -2003, have been considered and rejected by this Court on numerous occasions. As he has not presented us with sufficient or compelling reasons to justify reevaluation of these decisions, we decline to do so. *See, e.g., State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907, 65 L.Ed. 2d 1137 (1980) (death penalty statute not unconstitutionally vague or applied in an arbitrary or discriminatory manner); *State v. Jerrett,* 309 N.C. 239, 307 S.E. 2d 339 (death penalty statute not violative of a defendant's constitutional right to privacy).

**[16]** Defendant next argues that during the trial's sentencing phase, defendant's foster mother, Delores Stanley, was improperly denied the opportunity to relate and detail the contents of certain telephone conversations between Mrs. Stanley and defend-

ant's mother. Defendant claims that this evidence was relevant to three of the mitigating circumstances submitted to the jury for its consideration during sentencing. The record reveals that these conversations properly were not permitted before the jury because they were hearsay. *See generally* 1 Brandis on North Carolina Evidence §§ 138, 139 (1982 & Supp. 1986). Assuming, arguendo, that these conversations were admissible to explain defendant's mother's attitude towards defendant, we find that any error in excluding this testimony would have been harmless, given the ample other testimony before the jury revealing defendant's mother's attitude towards him.

[17]  Defendant next maintains that the trial judge committed error in admitting certain testimony of defendant's sister, Diane Johnson. Defendant contends this testimony was "improper, irrelevant, and prejudicial." After testifying on direct examination as to incidents of abuse and violence inflicted by their mother on defendant during defendant's and her childhood, Diane was questioned on cross-examination about an incident involving a fight between Diane and defendant's girlfriend, Lucy Turner. The prosecutor elicited testimony from Diane to the effect that on 10 October 1982, defendant's mother, Diane, Jerry Williams, and Diane's friend Gene Bailey went to the motel room which defendant and Lucy were sharing. Diane struck Lucy in the face, pulled her down onto a bed, and held her there while Lucy was assaulted by defendant's mother. Defendant asked the four visitors to leave, pulled his sister off Lucy, and tried to pull his mother off. When this happened, Jerry jumped into the affray, and, Diane testified, "[a]fter Jerry had jumped in, Bobby had pushed Jerry aside, and then Gene jumped in and Gene was pushed to the side; and by that time mama was still on Lucy." The following exchange then occurred:

BY MR. COMAN:

Q. Were any weapons drawn at that time?

    MR. SCHMIDLY: Object.

    THE COURT: Overruled.

    THE WITNESS: Yes.

By Mr. Coman:

Q. Tell the ladies and gentlemen of the Jury who drew a weapon.

A. My brother.

Q. And tell the ladies and gentlemen of the Jury what type of weapon was drawn.

Mr. Schmidly: Object.

The Court: Overruled.

The Witness: A knife.

By Mr. Coman:

Q. And tell the ladies and gentlemen of the Jury what, if anything, he did with it.

A. He cut his finger.

Q. What else happened?

A. Then we left.

Diane then testified that defendant merely took the knife out of his pocket, held it at his side, and told them to leave, but that he at no time pointed the knife at anyone. Thereafter, the prosecutor obtained an admission from Diane that on 10 July 1982, Diane had also assaulted one Maxine Branton by striking her in the face with her hands and fists and pulling her hair.

Defendant argues that all of the above testimony was remote and collateral and thus was irrelevant for impeachment purposes. He alleges that the testimony about defendant's pulling the knife also violated the prohibition in *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983), against cross-examination of a defendant's character witness with respect to specific acts of misconduct of defendant.

We do not find error in the admission of the testimony elicited from Diane on cross-examination concerning her part in the altercation in the TravelLodge on 10 October 1982. This testimony was competent to impeach Diane's testimony. *State v. Shane*, 304 N.C. 643, 285 S.E. 2d 813 (1982); *see generally* 1 Brandis on North Carolina Evidence § 43 (1982 & Supp. 1986). We do,

however, find error in the state's cross-examination of Diane concerning defendant's use of a knife during the fracas. "[C]ross-examination of a criminal defendant's character witness may not extend to particular instances of misconduct [of defendant]." *State v. Oliver*, 309 N.C. 326, 374, 307 S.E. 2d 304, 334; *State v. Wilkerson*, 295 N.C. 559, 573-74, 247 S.E. 2d 905, 913. Under the facts of the instant case, such testimony did not constitute prejudicial error. If anything, Diane's testimony that defendant first asked the visitors to leave, pulled his sister off his girlfriend, attempted to pull his mother off Lucy, and resorted to drawing his knife only after his pleas and interventions were ineffectual and the two male intruders jumped into the fight, shows that defendant was merely trying to protect and rescue someone who was being attacked. Diane's testimony indicated only that defendant found it necessary to display a knife as a last resort in order to break up the fracas which she and her mother initiated. The fact that defendant used the knife apparently in an effort to protect or aid a victim of physical assault may actually have impressed the jury favorably. For this reason and because of the "presence in the case of evidence quite persuasive of defendant's guilt," we hold that the error was not prejudicial. *Wilkerson*, 295 N.C. at 573, 247 S.E. 2d at 913.

[18] Defendant's next assignment of error concerns opinion testimony of Dr. Sherrow. During the penalty phase, the prosecutor attempted to show that defendant may have killed Ms. Phillips in an effort to avoid later identification and apprehension. In an effort to rebut this argument, defendant tried to elicit from Dr. Sherrow an opinion regarding defendant's motive in the killing. Defendant contends that it was error for the trial court to exclude the expression of this opinion, alleging that Dr. Sherrow's response would have excluded any motive to avoid detection and countered Dr. Rollins' testimony that defendant was able to form the specific intent to kill.

Our review of the record reveals that only moments before the objected-to exchange, the defense attorney had asked Dr. Sherrow if he had an opinion "as to whether when Bobby Ray Johnson killed Donna Phillips, he committed that act so that she would not be able to identify him?" The trial judge overruled the district attorney's objection to this question, and Dr. Sherrow replied, "No, I don't have an opinion." When defense counsel then

asked, for the second time, "Do you have an opinion that . . . he did do that so that she would not be able to identify him," the trial judge sustained the prosecutor's objection. Defense counsel then asked, "Do you have an opinion as to whether or not Bobby Ray Johnson acted out of any motive when he killed Donna Ray Phillips?" The trial judge sustained the district attorney's objection to this question, then held a brief bench conference on the matter. After the discussion off the record, Dr. Sherrow was permitted to state for the record, out of the hearing of the jury:

> I have an opinion. The opinion regards the mental state at the time of the offense. The opinion is that his thinking was jumbled and lacking in logical substance and guided by blind rage and fury at what he misinterpreted as significant provocation.

The defense attorney then asked the witness within hearing of the jury if he had an opinion "as to what Bobby Johnson's mental state was at the time that he killed Donna Ray Phillips," and the witness answered in a manner which substantially mirrored the statement previously excluded. We therefore find this assignment meritless.

[19] Defendant next contends that the trial court erred in refusing to allow defense counsel first to read and then make argument to the jury based on the last paragraph of N.C.G.S. § 15A-2000(b). The relevant part of that subsection provides:

> If the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment; provided, however, that the judge shall in no instance impose the death penalty when the jury cannot agree unanimously to its sentence recommendation.

Defendant contends that the court's denial of his request violated his right to inform the jury of the punishment prescribed for the offense charged, *State v. Walters*, 294 N.C. 311, 240 S.E. 2d 628 (1978); *see* N.C.G.S. § 84-14 (1985), and his right to advise the jury as to the result of its failure to reach unanimity in its sentencing recommendation. *Cf. State v. Jones*, 296 N.C. 495, 251 S.E. 2d 425 (1979) (in jury argument in sentencing phase of capital case, counsel may read or state to jury any rule of law or statute relevant

to the case, but error to allow reference to appellate review); *Caldwell v. Mississippi*, 472 U.S. ---, 86 L.Ed. 2d 231 (1985) (death sentence imposed by jury which was led to believe by prosecutor's argument that responsibility for determining the appropriateness of a death sentence rested not with the jury but with an appellate court, held invalid under eighth amendment). We find this contention to be without merit. This Court has repeatedly held that an instruction "that a sentence of life imprisonment would be imposed upon the defendant in the event that the jury was unable to reach unanimous agreement on the proper sentence" would be improper "because it would be of no assistance to the jury and would invite the jury to escape its responsibility to recommend the sentence to be imposed by the expedient of failing to reach a unanimous verdict." *State v. Williams*, 308 N.C. 47, 73, 301 S.E. 2d 335, 351-52, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177 (1983). *Accord, e.g., State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985); *State v. Boyd*, 311 N.C. 408, 319 S.E. 2d 189 (1984), *cert. denied*, 471 U.S. 1030, 85 L.Ed. 2d 324 (1985). We hold this is true whether such a statement is read by counsel or contained within the instructions of the trial court. The court did not err by denying defendant's request.

[20] In his next assignment of error, defendant argues that it was error for the trial court to instruct the jury that if it found aggravating circumstances to outweigh mitigating circumstances and that the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty, then it would be the jury's duty to recommend that defendant be sentenced to death. We have held this instruction not to be erroneous in numerous cases and affirm this holding. *E.g., State v. Boyd*, 311 N.C. 408, 319 S.E. 2d 189; *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197; *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203. This assignment of error is overruled.

[21] Defendant further complains of the manner in which the court instructed the jury with respect to two of the six statutory mitigating circumstances submitted to the jury: 15A-2000(f)(2), "The capital felony was committed while the defendant was under the influence of mental or emotional disturbance," and N.C.G.S. § 15A-2000(f)(6), "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the re-

quirements of law was impaired." Specifically, defendant's objections arise out of the manner in which the court described the evidentiary bases for the submission of these factors. In instructing the jury on the issue of whether defendant's capacity to appreciate and conform to the law was impaired, the court stated, in pertinent part:

Again, the Defendant need not wholly lack all capacity to conform. It is enough that such capacity as he might otherwise have had in the absence of atypical dissociative disorder and intoxication is lessend [sic] or diminished because of such atypical dissociative disorder and intoxication.

Now, generally, voluntary intoxication is no excuse for crime. However, you would find this mitigating circumstance if you find that Bobby Ray Johnson, Junior, suffered from atypical dissociative disorder and that during the evening hours before the killing had consumed such quantity of alcohol that he was at the time of the killing substantially impaired by and under the influence of a large amount of alcohol which exacerbated his mental disorder and that these factors in combination impaired his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law.

The court gave a similar instruction on the issue of whether defendant was under the influence of a mental or emotional disturbance at the time of the crime, charging:

For this mitigating circumstance to exist, it is enough that the Defendant's mind or emotions were disturbed from any cause; and that he was under the influence of the disturbance when he killed Donna Phillips. Generally, voluntary intoxication is no excuse for crime. However, members of the Jury, you would find this mitigating circumstance if you find that the Defendant suffered from an atypical dissociative disorder, felt provoked by interaction with Donna Phillips on the night and at the time in question; had a neglected and abused background and was substantially under the influence of a large amount of alcohol and that these factors acted in combination to produce escalating rage in the Defendant culminating in the killing of Donna Phillips and that as a result, Bobby Ray Johnson, Junior, was under the influence of mental disturbance when he killed Donna Phillips . . . .

Defendant's first objection is based on the court's conjunctive, simultaneous references to both defendant's intoxication and the atypical dissociative disorder allegedly resulting from his background of abuse and neglect. Defendant argues that the court's instructions improperly tended to suggest to the jury that defendant's intoxication in itself was not significant and that only if the jury considered it in combination with defendant's emotional disorder could the jury legitimately find his intoxication to be a factor in mitigation. He insists that the trial judge should have given a separate instruction on intoxication as requested. We find this contention meritless.

Under some circumstances, evidence of a defendant's intoxication at the time of the crime may properly be evaluated by the jury as a mitigating circumstance under N.C.G.S. § 15A-2000(f)(6). *E.g., State v. Moose,* 310 N.C. 482, 313 S.E. 2d 507 (1984); *State v. Irwin,* 304 N.C. 93, 282 S.E. 2d 439 (1981); *State v. Goodman,* 298 N.C. 1, 257 S.E. 2d 569 (1979). In the case sub judice, evidence of defendant's intoxication was originally presented as a mitigating circumstance in conjunction with defendant's emotional history. Cheryl Cassaro testified that earlier in the evening of 2 December 1982 defendant had been so intoxicated that he was stumbling. Defendant's own expert psychiatric witness, Dr. Sherrow, testified however that evidence of intoxication alone could not explain defendant's behavior. In his opinion, the effects of the alcohol, taken in combination with defendant's other emotional problems, triggered defendant's rage. The trial court's instructions were supported by the relevant evidence presented and were not erroneous.

Defendant also objects to a second aspect of the same instructions quoted above. He alleges that the trial court improperly suggested that the jury must find defendant to have been "substantially" impaired by the effects of alcohol at the time of the commission of the crime. This language, defendant contends, was not justified by the evidence presented and therefore constituted an opinion by the court in violation of N.C.G.S. § 15A-1222. This contention is wholly without merit. "When the defendant contends that his faculties were impaired by intoxication, such intoxication must be to a degree that it affects defendant's ability to understand and control his actions before subsection (f)(6) is applicable." *State v. Goodman,* 298 N.C. at 33, 257 S.E.

2d at 589. The trial court's instruction reflected the proper legal standard and cannot reasonably be interpreted as a comment on the evidence.

[22]　Defendant next argues that the trial court erred in refusing defendant's request that it submit defendant's age to the jury as a possible mitigating circumstance. N.C.G.S. § 15A-2000(f)(7) (1983). At the time of the commission of the crimes, defendant was twenty-three years old, but evidence presented by lay witnesses at the sentencing hearing was to the effect that defendant was emotionally immature for his age. Defendant correctly points out that "the chronological age of a defendant is not the determinative factor under G.S. § 15A-2000(f)(7)." *State v. Oliver*, 309 N.C. 326, 372, 307 S.E. 2d 304, 333 (no error in trial court's failure to peremptorily instruct that defendant's age, nineteen years eleven months, was a mitigating factor). However, in *Oliver*, the Court, quoting *Giles v. State*, 261 Ark. 413, 421, 549 S.W. 2d 479, 483, *cert. denied*, 434 U.S. 894 (1977), said, "Any hard and fast rule as to age would tend to defeat the ends of justice, so the term youth must be considered as relative and this factor weighed in the light of varying conditions and circumstances." 309 N.C. at 372, 307 S.E. 2d at 333.

Our recognition of this flexible and relative concept of age under N.C.G.S. § 15A-2000(f)(7) does not lead us to conclude that the trial court committed prejudicial error in the instant case. Defendant presented two witnesses, his foster parents, who offered largely conclusory statements that defendant was emotionally immature for his twenty-three years. Their opinions were founded primarily on their observations of defendant during the two years in which defendant lived with them from the time he was sixteen until he was almost eighteen years old. The factors supporting the Stanleys' assertions of immaturity were defendant's bed-wetting, "emotional" behavior, and being fired from his first full-time job. These factors cannot be viewed in isolation, particularly in light of defendant's other more mature qualities and characteristics to which the Stanleys testified. When balanced against defendant's chronological age of twenty-three, his apparently normal physical and intellectual development, and his level of experience, the evidence did not require the trial court to submit the mitigating circumstance listed at N.C.G.S. § 15A-2000(f)(7). *Cf. Eddings v. Oklahoma*, 455 U.S. 104, 115-16, 71 L.Ed. 2d 1, 11-12

(1982) (defendant's chronological age of sixteen, when combined with severe emotional disturbance, constituted a factor in mitigation); *Oliver*, 309 N.C. at 372, 307 S.E. 2d at 333.

**[23]** Next, defendant contends that the evidence introduced did not justify the trial court's submission to the jury of the possible aggravating circumstance that defendant's crime was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9) (1983). The evidence clearly reveals that defendant's acts upon the victim were characterized by "excessive brutality, physical pain and psychological suffering not normally present in a first degree murder case." *State v. Stanley,* 310 N.C. 332, 336, 312 S.E. 2d 393, 403 (1984); *State v. Blackwelder,* 309 N.C. 410, 306 S.E. 2d 783 (1983). The evidence shows that defendant and Williams sought Donna Phillips out and returned to pick her up for the express purpose of raping her. Once Ms. Phillips realized their intentions, her protestations were met with hostility and physical violence. Defendant's confession, corroborated by bloodstains in the car, indicates that she was stabbed at least once in the leg in the car, and there was also evidence that she was struck across the eye. Bruised and bleeding, she was dragged from the car, her clothing was ripped from her body, and she was stabbed in the arm. She was then thrown to the ground and sexually assaulted by defendant as Williams held her down. Defendant savagely bit her on the left breast, leaving a clear wound. All the while, Ms. Phillips was conscious, certainly in pain and aware that she was engaged in a life-and-death struggle, as she heard Williams urge defendant to "[g]o ahead and kill her." Defensive wounds on her hand indicated that she had attempted to fend off the knife attack. Defendant ultimately inflicted fifty-five stab wounds upon his victim, with perhaps fifteen to twenty minutes elapsing between the time Ms. Phillips was first stabbed in the car and the time she finally died. In sum, the facts are so egregious as to merit an instruction to the jury that it may find defendant's crime to have been especially heinous, atrocious, or cruel. *See, e.g., State v. Craig and State v. Anthony,* 308 N.C. 446, 302 S.E. 2d 740, *cert. denied,* 464 U.S. 908, 78 L.Ed. 2d 247 (1983) (defendants tried to rob their drunken victim, found no money, then stabbed her thirty-seven times despite her pleas for her life).

Defendant attempts to isolate the circumstances of his final fatal attack from those injuries and events which immediately

preceded it. According to defendant, the killing was "a separate act resulting from the peculiar nature of the defendant's own psyche." This argument is unconvincing. The cruelty and brutality of a particular crime is determined by looking at the facts as a whole. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203. The pain and terror experienced by Ms. Phillips during the attack upon her was not excused by "the peculiar nature of the defendant's own psyche." Defendant's preliminary acts of violence upon Ms. Phillips were all a part of the same transaction and may properly be considered in determining the propriety of the trial court's submission of the particular aggravating circumstance. This assignment of error is overruled.

[24] Finally, because in this opinion we set aside the verdict of defendant's guilt of murder in the first degree based on premeditation and deliberation, we hold that defendant's conviction of murder in the first degree is supported only by the jury's verdict of guilty based on felony murder, with rape constituting the predicate felony. Therefore, it was error to have submitted to the jury the aggravating circumstance: "Was this murder committed while Bobby Ray Johnson, Jr. was engaged in the commission of First Degree Rape?" *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983); *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796 (1980). Considering all the evidence in the case, we cannot say that the erroneous submission of this aggravating circumstance was harmless error beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1985). *See Cherry*, 298 N.C. 86, 257 S.E. 2d 551. Because of this error, we hold that defendant is entitled to a new sentencing hearing on his conviction of murder in the first degree.

The result is:

No. 82CRS64664 — first degree kidnapping — no error.

No. 82CRS64665 — first degree rape — judgment arrested.

No. 82CRS64663 — first degree murder — new sentencing hearing.

Justice BILLINGS did not participate in the consideration or decision of this case.