STATE OF NORTH CAROLINA v. JAMES WAYNE SMITH

No. 9213SC104

(Filed 18 May 1993)

1. **Indictment, Information, and Criminal Pleadings § 21 (NCI4th) — first degree sexual offense — omission of "with force and arms"**

The trial court did not err by denying defendant's motion to dismiss an indictment for first degree sexual offense because the indictment failed to properly allege that the offense was committed with force and arms. The holding of State v. Corbett, 307 N.C. 169 applies and, in any event, the indictment here uses the words "by force and against the victim's will[.]"

**Am Jur 2d, Indictments and Informations §§ 83, 84.**

2. **Kidnapping and Felonious Restraint § 21 (NCI4th) — kidnapping — purpose of terrorizing victim — evidence sufficient**

The evidence in a kidnapping prosecution was sufficient for the jury to infer an intent to terrorize where defendant kidnapped the victim from her work site and immediately began to transport her to a secluded wooded area; defendant's accomplice testified that defendant placed a knife against the victim's throat and told her he would cut her head off if she did not answer his questions honestly; the victim testified that defendant held her at gunpoint during virtually the entire ordeal; defendant placed a gun at the back or side of the victim's head on several occasions; defendant discharged a

.firearm near the back of the victim's head on no less than two occasions; the accomplice testified that defendant told him after the second occasion that he was just trying to scare the victim and had told her that the accomplice had sent him back to kill her; and the victim testified that defendant placed a gun beside her head, told her to raise her head, placed his penis in her mouth, and, after a minute, backed up, laughed, and said he was just trying to prove a point.

**Am Jur 2d, Abduction and Kidnapping § 32.**

3. **Robbery § 4.3 (NCI3d) — armed robbery — intent to deprive victim of property — evidence sufficient**

The trial court did not err by denying defendant's motion to dismiss an armed robbery charge where defendant contended that there was no evidence that defendant intended to permanently deprive the victim of her truck but an accomplice testified that defendant offered his brother the truck or anything he wanted and, after the brother refused the truck, the accomplice and defendant drove the truck about a mile down the road, got out, and defendant fired several shots into the truck around the gas tank.

**Am Jur 2d, Robbery §§ 18, 23.**

4. **Robbery § 5.2 (NCI3d) — armed robbery — special instructions — given in substance**

The trial court did not err in its instructions on armed robbery where it gave defendant's requested instructions in substance.

**Am Jur 2d, Robbery § 71.**

5. **Rape and Allied Offenses § 6.1 (NCI3d) — first degree sexual offense — instruction on attempted first degree sexual offense denied — no error**

The trial court did not err in a prosecution for first degree sexual offense, among other charges, by denying defendant's request to instruct the jury on attempted first degree sexual offense where the victim testified that defendant placed his penis in her mouth, stayed there about a minute, backed up, laughed, and said he was just trying to prove a point; an officer took a statement from the victim in which she said that defendant placed his penis in her mouth; another officer

STATE v. SMITH

[110 N.C. App. 119 (1993)]

took a statement in which the victim said that defendant told her he wanted oral sex, then changed his mind and said he couldn't do it; and an accomplice provided in a statement that defendant had told the accomplice that he tried to get the victim to have oral sex but that she didn't want to. The mere possibility that the jury might infer from one of the victim's statements that defendant did not force her to perform oral sex is not sufficient to require the court to submit the lesser offense. The statement to the accomplice that the victim refused to perform oral sex does not refute the victim's testimony that defendant placed his penis in her mouth because the act of oral sex entails more than is required for conviction of first degree sex offense by fellatio, which only requires "any touching by the lips or tongue of one person of the male sex organ of another."

**Am Jur 2d, Trial §§ 1427, 1430, 1432.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

6. **Robbery § 5.4 (NCI3d)— robbery—instruction on lesser offense of assault with deadly weapon—evidence of intoxication—sufficient**

The trial court erred by failing to give an instruction on assault with a deadly weapon as a lesser included offense of armed robbery where an accomplice testified that defendant was drinking liquor during the morning and consumed many alcoholic drinks during the day; he also testified that defendant was drunk and beginning to get crazy; the victim testified that she noticed the odor of alcohol about defendant when he got into the truck; and she also testified that she saw defendant drink a swallow or two of whiskey or brandy from a partially empty bottle. If there was evidence of lack of intent, the court should have instructed on the lesser offense.

**Am Jur 2d, Robbery §§ 66, 75.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

7. **Criminal Law § 803 (NCI4th)— instructions—lesser included offense—failure to object**

An issue was preserved for appeal in a prosecution for armed robbery and other offenses where the court instructed

STATE v. SMITH

[110 N.C. App. 119 (1993)]

the jury that it could consider evidence of defendant's intoxication to determine whether defendant had the requisite specific intent necessary to commit the crime of armed robbery, did not instruct the jury on the lesser included offense of assault with a deadly weapon, and the State argued that defendant did not request a further specific instruction linking the intoxication with the assault charge and did not object to the instruction given. Defense counsel asked the trial court to instruct the jury on the lesser offense of assault with a deadly weapon based on lack of evidence of permanent deprivation of property and this was sufficient to preserve the instruction for appeal; moreover, a defendant is entitled to a charge on a lesser included offense even when there is no specific prayer for such instruction when there is some evidence supporting the lesser included offense.

**Am Jur 2d, Trial §§ 876 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

8. **Kidnapping and Felonious Restraint § 14 (NCI4th) — kidnapping — instructions — degree — release in safe place — evidence insufficient**

The trial court did not err by not instructing the jury on second degree kidnapping where the victim testified that she was left tied to a tree in a wooded area off a dirt road and a detective testified that the area was 45 feet off the dirt road and 93 feet down a path, that the ground was damp, and that he saw snakes in the area.

**Am Jur 2d, Abduction and Kidnapping § 32.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

Judge COZORT concurring in part and dissenting in part.

Appeal by defendant from judgments entered 29 August 1991 by B. Craig Ellis in Brunswick County Superior Court. Heard in the Court of Appeals 3 March 1993.

Defendant was indicted and convicted of first degree kidnapping, felonious larceny of a firearm, first degree sexual offense and robbery with a firearm. Defendant was sentenced as follows:

life in prison for the first degree sexual offense; forty years in prison for first degree kidnapping; forty years in prison for robbery with a firearm; and ten years for larceny of a firearm. The sentences all run consecutively.

At trial Susan Watters testified that she was employed by David O. Watters Enterprises as a cable splicer. About mid-day on 22 April 1991 Ms. Watters was at work alone splicing cable along Highway 17 south of Shallotte, North Carolina when she noticed a gray station wagon pull up beside her truck, a black four-wheel drive Chevrolet. Ms. Watters got into her truck and went to eat lunch. Ms. Watters returned to her work site about 1:15 p.m., and resumed work. Once again, the gray station wagon pulled alongside her truck, and Ms. Watters noticed the defendant seated in the front passenger seat. The defendant asked her several questions. He then got out of the car, walked around to the back of her truck and asked her what she was doing. Ms. Watters returned to her work, and the defendant asked her if she actually knew what she was doing. As Ms. Watters turned to respond, the defendant stepped between her truck and the highway and pulled out a handgun. The defendant instructed Ms. Watters to walk over to the truck as if nothing was wrong. Ms. Watters walked over to the truck and the defendant cut off the truck's ignition. The defendant then opened the truck's door, told her that he wasn't going to hurt her and that he only wanted the truck. Ms. Watters told him to take the truck and leave, but the defendant refused and instead instructed her to get into the truck and sit in the middle. The defendant got in the truck, started it, pulled onto Highway 17 and started driving toward Grissettown. The gray station wagon followed.

The defendant drove to Grissettown and turned right on Highway 904. While he was driving, the defendant held the gun in his left hand and pointed it at Ms. Watters. The defendant stopped at an intersection, and the gray station wagon parked beside the road. The driver of the station wagon, a man with a mustache and long blond hair identified as Thomas Carr, got into the truck's driver's seat. The defendant moved into the passenger seat. Mr. Carr resumed driving.

After pulling back onto the road, the defendant and Mr. Carr began discussing whether to leave Ms. Watters tied up in a secluded area or make her drive to a bank robbery or use her as

a hostage. Mr. Carr eventually turned onto a dirt road which lead through a wooded area and toward the Waccamaw River. After turning onto the dirt road, the defendant noticed a box of .22 bullets in the truck's side pouch, and asked Ms. Watters where the gun was. Ms. Watters told the defendant that she did not know if a gun was in the truck and Mr. Carr stopped the truck. The men made Ms. Watters slide forward. Mr. Carr pulled the seat forward and the men found Ms. Watters' husband's .22 rifle. Mr. Carr handed the rifle to the defendant who fired it at the ground to see if it was loaded. The defendant reloaded the gun and the men began searching the truck. The men found a butcher knife and ammunition. The defendant grabbed Ms. Watters by her hair, "smashed [her] head back" and held the knife to the back of her neck while Mr. Carr finished searching the truck. At this time, Ms. Watters was beside the truck.

The men then told Ms. Watters to get back into the truck. The defendant, armed with the pistol, and Mr. Carr walked around to the truck's tailgate and began talking. The defendant then walked back to Ms. Watters, and asked her if she had overheard them. When she said she had not, he told her she was lying. The defendant grabbed Ms. Watters' arm and "snatched [her] out of the truck[,]" and put the pistol to the back of her head. Mr. Carr said "not to do it there" because "it would get all over the inside of the door of the truck, and they would have to get rid of that vehicle." The defendant then led Ms. Watters to a canal three or four steps away, held the gun at the back of her head and fired it. That shot did not wound Ms. Watters.

After the defendant fired the pistol he told Ms. Watters to get back into the truck. She did. Mr. Carr began driving the truck down the road again. The defendant, still holding the pistol, told her to look at the road and "be sure and see that there is nobody come down here in a long time, so nobody can help you." While driving down the road the men began discussing robbing a bank.

Mr. Carr stopped the truck at the end of the road. The men told Ms. Watters to get out, and the defendant, pointing the pistol at Ms. Watters, told her to take off her clothes and put them in the back of the truck. Ms. Watters did so. Mr. Carr approached her, dressed but with his penis exposed, and fondled her breasts. Ms. Watters "told him that he had promised they wouldn't hurt [her]. And for some reason he backed up and left [her] alone."

The defendant then grabbed Ms. Watters arm, led her to the canal, and held the gun to the back of her head again. The defendant told her to go back to the truck and put her clothes back on. While she was dressing the defendant asked her "if [she] liked to give head, and [she] told him no." Ms. Watters was then instructed to lay face down on the ground and put her arms behind her back. The defendant stood over her with the gun. Mr. Carr found some tape in the truck and attempted to tie Ms. Watters' hands. However, the tape kept breaking. The defendant asked Ms. Watters if there was anymore tape. She told him where there was some more tape. Mr. Carr retrieved the tape, 8½ inch wide black electrical tape, and tied her hands behind her back. At this time the defendant was still standing over her with a gun.

Mr. Carr then picked up Ms. Watters, stood her upright on her feet and all three walked over to a small ditch beside the truck. The three jumped the ditch and began walking up a path. After a short ways Mr. Carr taped Ms. Watters' ankles. The defendant, still holding the pistol, told Ms. Watters to get on her knees. Ms. Watters fell to her knees, and the defendant took out his penis. The defendant told Ms. Watters to raise her head, but she kept looking at the ground. The defendant placed the gun beside her head and said, "I told you to raise your head." When she did, the defendant placed his penis in her mouth. The defendant "stayed there about a minute and backed up and kind of laughed, and said [he] was just trying to prove a point." The defendant then told Mr. Carr to bring the tape. Mr. Carr walked over and taped up Ms. Watters' mouth. The defendant was standing in front of Ms. Watters with the gun. The two dragged Ms. Watters to a tree, made her sit in front of it, and "taped up [her] hands behind [her] back to the tree." The defendant told her that if he was not on the run he would take her with him. The men then left.

Ms. Watters heard two doors shut and the truck start. She then heard something to her right. As she began to raise her head to look, the defendant called her by name and told her not to raise her head. The defendant walked over, placed her husband's rifle at the base of her neck and told her that Mr. Carr wanted her dead because he did not want anybody to be able to identify him. The defendant then "moved the gun over and fired it four or five times and said, 'you're dead, get my drift, fall over.'" Ms. Watters slumped over to one side and the defendant left.

STATE v. SMITH

[110 N.C. App. 119 (1993)]

Ms. Watters waited a few moments, chewed through the tape around her mouth so that she could breathe, slipped her shoes off and used her feet and legs to get the tape off her ankles. She then put her feet on the tree and "pulled and twisted for quite some time" until she was able to free herself from the tree. Ms. Watters put her shoes back on and "took off" through the woods. Ms. Watters eventually got her hands free, took the tape off her face and put it in her shirt pocket. When she got to the river she swam across. She followed paths through the woods until she came to a house by the highway. She told two people that she had been kidnapped, and that she needed help. Someone then called the sheriff's department.

On cross-examination Ms. Watters testified that while in the truck she noticed an odor of alcohol about the defendant. She also testified that when Mr. Carr got into the truck, the defendant got a bottle of whiskey or brandy out of the station wagon. The bottle was partially empty. Ms. Watters saw the defendant drink "[a] swallow or two."

Mr. Carr also testified for the State. On 22 April 1991 Mr. Carr and the defendant left Wilmington at about 9:00 a.m. and drove to Shallotte in an old gray station wagon that Mr. Carr owned. While *en route* the defendant told Mr. Carr that he was going to rob a bank and that he wanted Mr. Carr to drive. Mr. Carr agreed to drive. The defendant showed Mr. Carr a .38 revolver.

Defendant and Mr. Carr drove to a trailer where they met two men and a woman. After a short while, all five drove to the local ABC store where they got two pints of liquor. They returned to the trailer and started drinking. Defendant and Mr. Carr left after about thirty to forty-five minutes. The two men drove around Shallotte "checking out different places as far as, you know, a place to, you know, stick up." The defendant then decided that they needed another vehicle, so the men continued to drive around, but started looking for another vehicle.

The defendant and Mr. Carr noticed Ms. Watters on the side of the road. Mr. Carr turned the car around and pulled up on the side of the road. At that time Ms. Watters was getting in her truck and pulling off. Later that day the two men passed by the same spot and saw Ms. Watters again. The defendant instructed Mr. Carr to pull over and he did. The defendant started talking to Ms. Watters, got out of the car, walked over to her

truck, talked with her for about a minute longer, and then got into the truck with Ms. Watters. At that time, the defendant had the .38 pistol with him. The truck pulled off and Mr. Carr followed.

Eventually, the two vehicles pulled over to the side of the road, and the defendant told Mr. Carr to leave his car there and to drive the truck. Mr. Carr began driving. He turned down a dirt road at the defendant's instruction. Ms. Watters was in the middle of the front seat between Mr. Carr and the defendant. The defendant was holding the .38 pistol. While in the truck, the defendant asked Ms. Watters when she was expected back at work or at home. The defendant threatened to kill her if she didn't tell the truth and "[a]t one point he pulled a knife and put i[t] up against her throat and told her he would cut her head off if she didn't tell him the truth."

Mr. Carr stopped the truck and the defendant and Ms. Watters got out on one side. The defendant told Mr. Carr that he had seen some shells and that he knew there was a gun in the truck. The defendant put his pistol up to Ms. Watters' head and told her he knew there was a gun in the truck. Ms. Watters said she did not know if there was or not. Mr. Carr pushed the seats back, found a .22 rifle and gave it to the defendant. The defendant "checked it out, looked at it, and loaded it." He then told Mr. Carr to take Ms. Watters' money from her purse, got into the truck and drove further down the dirt road. The defendant was pointing the .38 pistol at Ms. Watters. After driving a short distance, Mr. Carr stopped the truck and all three got out. The defendant had Ms. Watters stand by the passenger side of the truck while he and Mr. Carr walked to the back of the truck where the defendant said, "[L]ook, . . . I'm going to go ahead and, you know, rape and kill this bitch. . . ." Mr. Carr testified that he became upset because he had no intentions of raping or killing anybody. Mr. Carr tried to talk the defendant out of killing Ms. Watters but the defendant insisted. The two men walked back over to Ms. Watters. The defendant then told her to take off her clothes. The defendant motioned to Mr. Carr with the gun and Mr. Carr went around in front of Ms. Watters and touched her breast. Mr. Carr then stepped back, undid his pants and "slipped out" his penis. Ms. Watters said "[P]lease, sir, you promised not to hurt me." Mr. Carr zipped his pants up, and told the defendant that they had promised not to hurt her. The defendant then told Ms. Watters to get dressed.

After Ms. Watters got dressed the defendant placed the .38 pistol beside Ms. Watters' head and pulled the trigger firing the gun. The defendant told Mr. Carr to tape her up. Mr. Carr complied. The two then discussed whether to leave Ms. Watters out in the woods or take her as a hostage. The three then jumped over a "waterway" and sat Ms. Watters down. Mr. Carr went back to the truck. Three or four minutes later the defendant walked up to the truck and told Mr. Carr to tape up Ms. Watters' mouth and tape her to the tree. Once again, Mr. Carr complied. The two men returned to the truck, and the defendant told Mr. Carr that he would be back in a minute. In his statement to the police, Mr. Carr said that at this time the defendant "was drunk and beginning to get real crazy." While he was gone, Mr. Carr heard three shots from the .22 rifle. The defendant returned, and Mr. Carr asked if he had killed Ms. Watters. The defendant said, "[N]o, I was just trying to scar [sic] her, but I made you look like the heavy. I told her you sent me back there to kill her." The two men then drove off in the truck.

They went to the ABC store, where they got another pint of liquor, and to a drug store, where they got a box of surgical gloves. The two men then returned to where they had left Ms. Watters and discovered that she had escaped. The men drove toward Leland where the defendant's brother (or brother-in-law) lived. The defendant gave the .22 rifle to his brother and offered him the truck. The defendant's brother told the defendant that he didn't want the truck. Thereupon, the defendant and Mr. Carr got into the truck and drove it about a mile from the defendant's brother's house. The defendant and Mr. Carr got out of the truck, and the defendant "took the .38 and emptied it into the truck where the gas tank was at." The defendant and his brother then took Mr. Carr home. The next morning Mr. Carr turned himself in to the sheriff's department.

On cross-examination Mr. Carr testified that the defendant consumed "many" alcoholic drinks during the day in question including the "vast majority" of a pint of liquor after they left Ms. Watters in the woods. The alcohol appeared to make the defendant meaner and wilder as the day progressed. Finally, Mr. Carr also testified that the defendant told him that he had attempted to have Ms. Watters perform oral sex upon him but that she refused.

STATE v. SMITH

[110 N.C. App. 119 (1993)]

Det. Gene Caison of the Brunswick County Sheriff's Department testified that on 22 April 1991 he talked to Ms. Watters. Ms. Watters' statement was substantially the same as her testimony set out above. However, Det. Caison said that Ms. Watters told him that the defendant had "tried to get her to perform oral sex." Det. Caison also testified that he was involved in the defendant's arrest. Sometime later, when Det. Caison began to leave a room in which the defendant was located, the defendant started a conversation. Det. Caison testified:

Q. And could you tell the jury what he said to you at that point in time?

A. When I started to stand to leave, Mr. Smith stated, "is the girl all right?" And I said "yes." He then said, "I know she's hurt up here," and he was doing this, (indicating) as he said it. He then said, "I know it's not worth much, but if you see her, tell her I'm sorry." I said, "okay." He then said, "things just got out of hand. I don't know why. Well, I do too. I'm an alcoholic and a drug addict."

On cross-examination, Det. Caison read his investigative report. That report in part stated that "[t]he victim got on her knees, and the [defendant] told the victim that he wanted oral sex. Subject then changed his mind and said he couldn't do it."

Det. Nancy Simpson of the Brunswick County Sheriff's Department also read into evidence a detailed statement that she took from Ms. Watters on 29 April 1991. That statement provided in part:

The younger man walked to the truck and the older man [the defendant] stayed with her. He put the gun to her head, and cocked it, and placed his penis in her mouth. She thought she was going to be killed at that point. He moved his penis and said, "that's enough. I just wanted to prove a point."

The defendant did not present any evidence. From judgment imposing sentence, defendant appeals.

*Attorney General Lacy H. Thornburg, by Special Deputy Attorney General, Daniel C. Oakley, for the State.*

*Michael R. Ramos for the defendant-appellant.*

EAGLES, Judge.

I.

**[1]** Defendant first argues that the trial court erred by denying his motion to dismiss the indictment in 91CrS3100 (first degree sexual offense) because the indictment failed to properly allege an offense as required by G.S. § 15-144.2 and G.S. § 15A-924. Specifically, defendant argues that the indictment was insufficient under G.S. § 15-144.2, G.S. § 15A-924 and *State v. Dillard*, 90 N.C. App. 320, 368 S.E.2d 422 (1988), because it failed to allege that the offense was committed with force and arms.

In *State v. Corbett*, 307 N.C. 169, 297 S.E.2d 553 (1982), our Supreme Court addressed substantially the same argument as it related to first degree rape. Our Supreme Court noted that G.S. § 15-155 provided, in part, that:

> No judgment upon any indictment for felony or misdemeanor, whether after verdict, or by confession, or otherwise, shall be stayed or reversed for . . . omission of the words . . . "with force and arms," . . . .

*Id.* at 174, 297 S.E.2d at 558. Our Supreme Court then held:

> We therefore must determine whether the inclusion of the averment "with force and arms," though not necessary by virtue of G.S. § 15-155, is nevertheless mandated by G.S. § 15-144.1(a). We do not read this statute as either *requiring* the averment or as expressing a legislative intent that the language in G.S. § 15-144.1(a) prevail over the express language in G.S. § 15-155 which states in effect that no judgment shall be stayed or reversed because of the omission of the words "with force and arms" from the indictment. As the bill of indictment upon which defendant was charged comports with the requirements of G.S. § 15-144.1(a), this assignment of error is overruled.

*Id.* at 175, 297 S.E.2d at 558.

The holding in *Corbett* applies with equal force here. In any event, we note that the indictment here uses the words "by force and against the victim's will[.]" This language is sufficient. *See, State v. Dillard*, 90 N.C. App 318, 368 S.E.2d 422 (1988) (upholding sexual offense indictment that used the words "by force and against

the victim's will" instead of "with force and arms"). This assignment is overruled.

## II.

[2] Defendant next argues that the trial court erred by failing to dismiss the charge of kidnapping because there was insufficient evidence that the purpose of the kidnapping was to terrorize Ms. Watters. We disagree.

"[W]here the indictment for a crime alleges a theory of the crime, the State is held to proof of that theory and the jury is only allowed to convict on that theory." *State v. Taylor*, 304 N.C. 249, 275, 283 S.E.2d 761, 778 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *rehearing denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983).

Defendant contends that a review of the evidence will show that the purpose of the kidnapping of Ms. Watters was either to hold her as a hostage or to obtain another vehicle to facilitate a bank robbery. The indictment alleges that the defendant kidnapped Ms. Watters "for the purpose of terrorizing her." Defendant's argument overlooks a record replete with evidence from which a jury could find that the defendant kidnapped Ms. Watters with the intent to terrorize her.

The defendant kidnapped Ms. Watters from her work site and immediately began to transport her to a secluded wooded area. Mr. Carr testified that while *en route* the defendant placed a knife against Ms. Watters' throat and "told her he would cut her head off" if she did not answer his questions honestly. Ms. Watters testified that during virtually the entire ordeal the defendant held her at gunpoint, that on several occasions the defendant placed a gun at the back or side of her head, and that on no less than two occasions the defendant discharged a firearm near the back of her head. Indeed, Mr. Carr testified that after the second occasion, the defendant told him, "I was just trying to scar [sic] her, but I made you look like the heavy. I told her you sent me back there to kill her." Furthermore, Ms. Watters testified that the defendant placed a gun beside her head, told her to raise her head and then placed his penis in her mouth. After a minute the defendant "backed up and kind of laughed, and said [he] was just trying to prove a point." This evidence is sufficient for a jury

to infer an intent to terrorize. Accordingly, this argument is overruled.

## III.

[3]   Defendant next argues that the trial court erred by denying his motion to dismiss the charge of armed robbery because there was insufficient evidence that the defendant intended to permanently deprive the owner of the possession of the truck Ms. Watters was driving. Defendant cites *State v. Smith*, 268 N.C. 167, 150 S.E.2d 194 (1966).

In *Smith*, our Supreme Court stated that "[i]n robbery, as in larceny, the taking of the property must be with the felonious intent *permanently* to deprive the owner of his property." *Id.* at 170, 150 S.E.2d at 198. (Citations omitted.) However, the Court then went on to hold that:

> When, in order to serve a temporary purpose of his own, one takes property (1) with the specific intent wholly and permanently to deprive the owner of it, or (2) under circumstances which render it unlikely that the owner will ever recover his property and which disclose the taker's total indifference to his rights, one takes it with the intent to steal (*animus furandi*). A man's intentions can only be judge by his words and deed; he must be taken to intend those consequences which are the natural and immediate results of his acts. If one who has taken property from its owner without any color of right, his intent to deprive the owner wholly of the property "may, generally speaking, be deemed proved" if it appears he "kept the goods as his own 'til his apprehension, or that he gave them away, or sold or exchanged or destroyed them. . . ." State v. South, 28 N.J.L. 28, 30, 75 Am. Dec. 250, 252.

*Id.* at 173, 150 S.E.2d at 200.

Defendant argues that there is no evidence that the defendant intended to permanently deprive the owner of the truck. To the contrary, we find more than ample evidence that the defendant had the specific intent to wholly and permanently deprive the owner of the possession of the truck and no evidence that the defendant "took the vehicle for a temporary use only."

Defendant points out that the defendant "left the truck in plain view and in the vicinity of Leland, North Carolina[,]" and

based on that fact, defendant contends there is no evidence that the defendant intended to permanently deprive the owner of the truck of its use.

Mr. Carr testified that the defendant "[o]ffered [his brother] the truck or anything he wanted." Additionally, Mr. Carr testified that after the defendant's brother refused the truck, he and the defendant drove the truck about a mile down the road. The two men got out of the truck, and the defendant fired several shots with a .38 pistol into the truck "where the gas tank was at." The State has presented ample evidence that the defendant intended to permanently deprive the owner of the truck.

IV.

[4] By this argument defendant contends that the trial court erred in denying his request for special instructions on armed robbery. Defendant reiterates his contention that there was insufficient evidence of defendant's intent to permanently deprive the owner of the truck of its use. Defendant's brief argues:

> At the instruction conference the Defendant tendered a written instruction on the charge of armed robbery. It requested that the court instruct the jury that in order to find the Defendant guilty of armed robbery they must find beyond a reasonable doubt that the Defendant had the specific intent to deprive the owner permanently of possession of the 1990 truck and to convert it to his own use and if they did not so find or had reasonable doubt as to that then they should find the Defendant not guilty of armed robbery.

We have closely examined the instructions given by the trial court and hold they give the defendant's requested instruction in substance. Accordingly, this assignment is overruled. *State v. Corn*, 307 N.C. 79, 296 S.E.2d 261 (1982).

V.

[5] Defendant next argues that the trial court erred by denying his request to instruct the jury on the lesser included offense of attempted first degree sexual offense. We disagree.

> The law is well settled that the trial court must submit and instruct the jury on a lesser included offense when, and only when, there is evidence from which the jury could find that defendant committed the lesser included offense. However,

when the State's evidence is positive as to every element of the crime charged and there is no conflicting evidence relating to any element of the crime charged, the trial court is not required to submit and instruct the jury on any lesser included offense. The determining factor is the presence of evidence to support a conviction of the lesser included offense.

*State v. Boykin*, 310 N.C. 118, 121, 310 S.E.2d 315, 317 (1984) (citations omitted). Error in failing to instruct on a lesser offense is not cured by a verdict of guilty of the greater offense. *State v. Bell*, 284 N.C. 416, 200 S.E.2d 601 (1973).

Defendant argues that there is conflicting evidence warranting instruction on the lesser offense of attempted first degree sexual offense. At trial Ms. Watters testified that the defendant "placed his penis in [her] mouth." The defendant "stayed there about a minute and backed up and kind of laughed, and said I was just trying to prove a point." Det. Simpson testified that she took a statement from Ms. Watters. According to that statement, Ms. Watters told Det. Simpson that the defendant "placed his penis in her mouth." Det. Caison also took a statement from Ms. Watters. According to that statement, Ms. Watters said she "got on her knees, and the [defendant] told [her] that he wanted oral sex. [The defendant] then changed his mind and said he couldn't do it." Mr. Carr also gave a statement to Det. Caison. That statement provided that the defendant told Mr. Carr that "he tried to get her to have oral sex with him but that she didn't want to." Mr. Carr further testified under cross-examination:

> Q. And you recall to the best of your ability that Mr. Smith said to you that he attempted to get—to have her perform oral sex but that she refused?
>
> A. Yes, sir. That's what he informed me of, yes.

"The mere possibility that the jury might believe part but not all of the testimony of the prosecuting witness is not sufficient to require the Court to submit to the jury the issue of the defendant's guilt or innocence of a lesser offense than that which the prosecuting witness testified was committed." *State v. Lampkins*, 286 N.C. 497, 505, 212 S.E.2d 106, 110 (1975), *cert. denied*, 428 U.S. 909, 49 L. Ed. 2d 1216 (1976). Here, Ms. Watters testified at trial that the defendant placed his penis in her mouth. The mere possibility that the jury might infer from her statement to

Det. Caison that the defendant did not force her to perform oral sex is not sufficient to require the court to submit the lesser offense to the jury.

Moreover, the defendant's statement to Mr. Carr does not conflict with Ms. Watters' testimony. Mr. Carr told Det. Caison that the defendant said "he tried to get her to have oral sex with him, but that she didn't want to." The act of oral sex entails more than is required for conviction of first degree sexual offense by fellatio. Fellatio only requires "any touching by the lips or tongue of one person of the male sex organ of another." *State v. Hewett*, 93 N.C. App. 1, 12, 376 S.E.2d 467, 473 (1989) (citing *State v. Bailey*, 80 N.C. App. 678, 682, 343 S.E.2d 434, 437 (1986), *review dismissed*, 318 N.C. 652, 350 S.E.2d 94 (1986)). The defendant's statement that Ms. Watters refused to perform oral sex does not refute Ms. Watters' testimony that the defendant "placed his penis in [her] mouth." *But cf. State v. Rhinehart*, 322 N.C. 53, 366 S.E.2d 429 (1988). Accordingly, this assignment is overruled.

VI.

**[6]** Defendant next argues that the trial court erred by failing to give an instruction on armed robbery's lesser included offense, assault with a deadly weapon, because there was conflicting evidence of the defendant's specific intent to permanently deprive the owner of the use of his property. Specifically, defendant claims he was entitled to the instruction for two reasons: (1) there is conflicting evidence of defendant's intent to permanently deprive and (2) there was evidence that the defendant was intoxicated.

"Assault with a deadly weapon is a lesser included offense of the crime of robbery by firearm." *State v. Davis*, 31 N.C. App. 590, 591, 230 S.E.2d 203, 204 (1976). Intent is not an element of assault with a deadly weapon. *State v. Curie*, 19 N.C. App. 17, 198 S.E.2d 28 (1973). Accordingly, if there was evidence supporting a finding of lack of intent, the court should have instructed on the lesser offense.

We have already decided defendant's first argument against him under heading III, *supra*. The dispositive question here, then, is whether the defendant's alleged intoxication required the trial court to instruct on assault with a deadly weapon.

We hold that there is ample evidence in the record to warrant submission of the lesser offense of assault with a deadly weapon

to the jury. Mr. Carr testified that the defendant began drinking liquor during the morning of 22 April 1991, and that during the day, the defendant consumed "many" alcoholic drinks. Mr. Carr also testified that when they were in the woods, the defendant "was drunk and beginning to get real crazy." Ms. Watters testified that when the defendant got into the truck with her she noticed the odor of alcohol about him. She also testified that after Mr. Carr got into the truck she saw the defendant drink "[a] swallow or two" of brandy or whiskey from a partially empty bottle. Based on this testimony, the trial court instructed the jury that it could consider the evidence of defendant's intoxication to determine whether the defendant had the requisite specific intent necessary to commit the crime of armed robbery with a firearm.

We hold that based on this same testimony the trial court should have submitted to the jury the lesser offense of assault with a deadly weapon. Accordingly, we reverse defendant's conviction for robbery by firearm and remand for a new trial on this charge.

[7]  We note in passing, however, that the State argues that "[t]he defendant did not request further specific instruction linking the intoxication with an assault charge and he did not object to the instruction given." The transcript clearly reveals that defense counsel asked the trial court to instruct the jury on the lesser offense of assault with a deadly weapon based on lack of evidence of "permanent deprivation of property." This was sufficient to preserve the instruction for appeal. In any event, "[r]egardless of requests by the parties, a judge has an obligation to fully instruct the jury on all substantial and essential features of the case embraced within the issue and arising on the evidence." *State v. Harris*, 306 N.C. 724, 727, 295 S.E.2d 391, 393 (1982). "[W]hen there is some evidence supporting a lesser included offense, a defendant is entitled to a charge thereon even when there is no specific prayer for such instruction. . . ." *Bell*, 284 N.C. at 419, 200 S.E.2d at 603 (1973).

The State also argues that "the evidence does not even support the intoxication charge. *See, State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986)." *Johnson* is clearly distinguishable from the instant case. In *Johnson* our Supreme Court rejected defendant's argument that the trial court should have instructed on intoxication by drugs. In doing so the Court noted that there was no evidence to support the defendant's assertion that he had consumed drugs or was intoxicated at the relevant time.

## VII.

[8]   Finally, defendant argues that the jury should have been instructed on the lesser included offense of second degree kidnapping. Defendant argues that there was evidence from which the jury could conclude that the victim was released in a safe place. We disagree.

Defendant contends that the only evidence concerning where the victim was released was Det. Caison's statement that she was released in a "woodland" area. Ms. Watters testified that she was left tied to a tree in a wooded area off of a dirt road. Moreover, defendant completely overlooks the remainder of Det. Caison's description of the area where Ms. Watters was left. Det. Caison testified that the area was 45 feet off a dirt road and 93 feet down a path to the tree. Det. Caison also testified that the ground was damp, and that when he returned to the area the next day he saw snakes. This argument is wholly without merit.

## VIII.

In conclusion, we find no error in defendant's convictions for first degree kidnapping (91 CRS 2720), larceny of a firearm (91 CRS 2722), and first degree sexual offense (91 CRS 3100). We reverse defendant's conviction for robbery with a firearm (91 CRS 3332) and remand for a new trial.

No error in part; reversed and remanded in part.

Judge WYNN concurs.

Judge COZORT concurs in part and dissents in part.

Judge COZORT concurring in part and dissenting in part.

I concur with all of the majority opinion except that portion which holds that the failure of the trial court to instruct the jury on assault with a deadly weapon, as a lesser included offense of armed robbery, requires the reversal of defendant's conviction in 91 CRS 3332 and an order for a new trial. The issue is whether the trial court was required to instruct the jury on the lesser charge of assault with a deadly weapon, in addition to giving the instruction on the defense of voluntary intoxication. I vote the trial court committed no error.

A trial court need not submit lesser included offenses to the jury when the State's evidence is positive as to each and every element of a crime charged and there is no conflicting evidence relating to any element of such crime. *State v. Drumgold*, 297 N.C. 267, 271, 254 S.E.2d 531, 533 (1979). "[T]he contention that the jury might accept the evidence in part and reject it in part is not sufficient to require an instruction on a lesser included offense." *State v. Coats*, 46 N.C. App. 615, 617, 265 S.E.2d 486, 487 (1980).

Our case law makes it clear that intoxication may affect one's ability to form the specific intent required to commit robbery with a firearm. *State v. White*, 322 N.C. 506, 515-16, 369 S.E.2d 813, 817-18 (1988). Nonetheless, evidence of intoxication should not automatically require an instruction on the lesser included offense of assault with a deadly weapon where an instruction on voluntary intoxication has been given. In the present case, the defendant requested and received the correct instruction on voluntary intoxication. The general instruction given on voluntary intoxication allowed the jury to consider the evidence of defendant's intoxication in its deliberations. The jury could have determined the intoxication negated an element of the armed robbery. The defendant should not now be heard to complain that he was entitled to more.

I vote no error on all counts and respectfully dissent.